## EXHIBIT A

Linda J. Niedweske – Attorney ID No. 030391988
Jessica L. Mariconda – Attorney ID No.  018432011
NIEDWESKE BARBER LLC
98 Washington Street
Morristown, New Jersey 07960
*Phone:   (973) 401-0064*
Fax:    (973) 401-0061
www.n-blaw.com
Attorneys for Plaintiff Wanda Wilson

|  |  |
|---|---|
| WANDA WILSON,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE, JAMES DIMON,<br>individually and in his official capacity,<br>JANE and/or JOHN DOES 1-10, and XYZ<br>Entities 1 to 10.<br><br>　　　　　Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – ESSEX COUNTY<br>DOCKET NO.<br><br>Civil Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Wanda Wilson, through her attorneys Niedweske Barber LLC, by way of

Complaint against Defendants JPMorgan Chase ("JPM"), Jamie Dimon, in his individual and

official capacity ("Dimon"), Jane and/or John Does 1-10, and XYZ Entities 1-10 (collectively

referred to as "Defendants"),

## PARTIES

1.  Plaintiff Wilson is a New Jersey citizen residing at 15 Martin Lane, Township of

Piscataway, County of Middlesex, and State of New Jersey.

2.  During all times relevant to this Complaint, Plaintiff Wilson was an employee of

Defendant JPM as the term "employee" is defined by the New Jersey Law Against

Discrimination, N.J.S.A. 10:5-1, *et seq.* ("NJLAD").

3.      Defendant JPM is one of the oldest financial institutions in the United States and presently a leading global financial services firm with assets of $2.6 trillion, a presence in over 100 markets, and over 250,000 employees serving millions of consumers, small business, and many of the world's most prominent corporate, institutional and government clients.  Defendant JPM is also a leader in investment banking, financial services for consumers and small business, commercial banking, financial transaction processing and asset management.

4.      During all times relevant to this Complaint, Defendant JPM has been an "employer" as the term is defined by the NJLAD.

5.      During all times relevant to this Complaint, Defendant JPM has acted and continues to act through its entities, employees, agents, agencies, departments and divisions.

6.      Since December 31, 2006, Defendant Dimon has been and continues to be the Chairman of the Defendant JPM Board and, since December 31, 2015,  he has been Chief Executive Officer and President of the Defendant JPM Board.  Defendant Dimon was President and Chief Operating Officer following Defendant JPM's merger with Bank One Corporation in July 2004.

7.   Defendant Dimon, as a member of upper management, aided and abetted Defendant JPM's violation of Plaintiff Wilson's rights protected by the NJLAD.

8.      Defendants Jane Doe(s) 1 to 10 and John Doe(s) 1 to 10 and XYZ Entities and/or State Departments and/or State Divisions 1 to 10 are any Defendant State of New Jersey agents or actors or government entities, departments or divisions which are in any way involved in the unlawful acts alleged in this Complaint.

## VENUE

9.　　　Pursuant to Rule 4:3-2, venue is proper in Essex County as Defendants regularly conduct business there.

## STATEMENT OF FACTS

### A.  **Plaintiff Wilson's Twenty Years of Exemplary Employment With Defendant JPM**

10.　　　Plaintiff Wilson, an African American woman, began her employment with Defendant JPM in or about 1997 and was terminated in or about May/June 2018 when she held the position of Executive Administrative Assistant.

11.　　　As an Executive Administrative Assistant, Plaintiff Wilson provided administrative support for Defendant JPM senior officers and back-up support in the executive offices where Defendant Dimon's office was located.

12. Throughout her employment with Defendant JPM, Plaintiff Wilson always received meets or exceeds expectations on her performance reviews and she was never reprimanded or disciplined.

13.　　　Plaintiff Wilson was considered an exemplary employee who was respected by Defendant JPM upper management, her colleagues, and any member of the Defendant JPM community with whom she interacted.

14. In or about 2003, when Plaintiff Wilson's sister was brutally murdered by Plaintiff Wilson's ex-husband, Defendant JPM supported her throughout this ordeal by providing her with emotional and moral support.

15. Defendant JPM even paid for Plaintiff Wilson to stay at a hotel while her home was a crime scene.

16. Plaintiff Wilson returned this support by her dedication as evidenced by her arriving

to work at 7:30 a.m. each day, not taking lunch, normally leaving at 7:30 p.m. and, as needed, staying until anywhere from 9:30 p.m. to midnight to prepare for board meetings or other projects.

17. Plaintiff Wilson attended Defendant JPM Town Halls where she heard Defendant Dimon repeatedly tell Defendant JPM employees that he reads every email and he should be contacted if there are any issues which an employee has been unable to resolve.

18. Defendant Dimon further stated that he cannot provide assistance if he is not aware of the problem.

19. For the twenty (20) years of Plaintiff Wilson's employment, Defendant JPM played a major and substantial role in her life and how she defined herself.

20. As an African American woman, who was fifty-five (55) years old in 2017 and never graduated college, Plaintiff Wilson was proud of her accomplishments at Defendant JPM.

21. Over the years, Plaintiff Wilson noticed the disparity in the terms and conditions of employment at Defendant JPM between African-American employees and their non-African American counterparts, including promotional opportunities, compensation and other perquisites of Defendant JPM employment.

22.     Plaintiff Wilson never spoke out about these disparities publicly as she had seen other African Americans objecting to Defendant JPM discriminatory practices facing adverse consequences.

23.     As her reward for not speaking out, Plaintiff Wilson was the only African American employee who worked in the executive office suite because, as she was told, she was not like the others, meaning her African American colleagues.

24.     The racial disparity at Defendant JPM was so well known that, in or about August 2017, Defendant Dimon felt compelled to address the issue when in an interview he stated:

JPMorgan is also 'making a special effort' to bring on more African-Americans by setting up a separate group to focus on school recruiting, retention and hiring 'more senior African-American talent. It's starting to work. The numbers are getting better and it's different. We have to acknowledge the reason it's different is it's a different history, a different background. A lot of African-Americans didn't grow up in the same neighborhood as white people. We're doing great with women, we're doing great with Asians, we're doing great with Hispanics. We've got to do better with African-Americans and we're going to.

25.     Plaintiff Wilson believed in Defendant Dimon's sincerity and believed that he was committed to resolving the racial disparity within Defendant JPM.

**B.  Plaintiff Wilson Is Subjected To A Hostile Working Environment.**

26.     In or about March 2016, Plaintiff Wilson was assigned as the Executive Administrative Assistant for Paul Jensen, Managing Director, Chief Administrative Officer and Head of Audit, ("Jensen").

27.     At or about this same time, Janet Jarnigan, Executive Director, Audit Manager ("Jarnigan") was also assigned to Paul Jensen as Team Leader.

28.     Initially, Jensen, Jarnigan and Plaintiff Wilson worked well as a team.

29.     However, as the months progressed, Jarnigan and Jensen developed a closer working relationship even traveling together on business.

30.     Plaintiff Wilson was no longer an integral member of this team and had been relegated to a more subservient role.

31.     Over the next several months, the respectful tone with which Jarnigan addressed Plaintiff Wilson had slowly deteriorated so that by December 2016, Jarnigan was ordering

Plaintiff Wilson to bring her lunch, offering Plaintiff Wilson's administrative services to

Defendant JPM consultants and third parties without checking Plaintiff Wilson's availability or if

it was appropriate to even offer her services.

32.     Jarnigan's treatment of Plaintiff Wilson was dramatically different than her

treatment of the non-African American Executive Administrative Assistants with whom Jarnigan

worked.

33.     When Plaintiff Wilson was unable to comply with Jarnigan's orders because of

more pressing work responsibilities, Jarnigan would often complain to Jensen that she was being

uncooperative.

34.     As the months passed, Jarnigan became more deliberate and overt in her

demeaning treatment of Plaintiff Wilson,

35.     Plaintiff Wilson complained to Jensen that Jarnigan was exceeding her authority,

that she was spreading false rumors about Plaintiff Wilson to other secretaries and, in general,

creating a hostile working environment.

36.     Jensen's response was that there were two sides to every story, accused Plaintiff

Wilson of being "a bit dramatic" and refused to intervene.

37.     Plaintiff Wilson then filed a complaint with Samantha Garber, Executive Director

& Head of Audit, HR ("Garber"), seeking her intervention to remediate the hostile working

environment.

38.     As a result of her filing a complaint with H.R., Plaintiff Wilson noticed a dramatic

change in Jensen's attitude toward her in that he began questioning her work and treating her

with distrust.

39.     His responses to her were terse and dismissive.

40.     Plaintiff Wilson also noticed her colleagues distancing themselves from her exacerbating the hostile work environment and causing her to feel increasingly isolated.

41.     On or about April 4, 2017, several of Plaintiff Wilson's colleagues told her that Jarnigan had been spreading false rumors about her, including that she had made one of the non-African American officers cry when she yelled at her and that she had become such a problem that Garber had reprimanded her in December 2016.

42.     Jarnigan even mockingly referred to the stack of folders between their desks as the Mexican/U.S. wall as evidence of Plaintiff Wilson's recalcitrance which, in fact, were there to create a filing system that Jensen had requested.

43.     After months of being demeaned, bullied, disrespected and relegated to a waitress, Jarnigan's campaign of mockery and attempts to discredit Plaintiff Wilson's reputation were more than Plaintiff Wilson could endure and she left the office frantic and embarrassed.

44.     For the first time in her career with Defendant JPM, Plaintiff Wilson found herself treated with the same derision she had seen directed at other Defendant JPM African-American employees, who were forced to endure the treatment to maintain their employment or speak out and face retaliation.

45.     On or about April 5, 2017, Plaintiff Wilson took a sick day and called Garber toagain report the hostile work environment that Jarnigan was perpetuating by spreading false rumors and sabotaging Plaintiff Wilson's reputation.

46.     She further complained that Jarnigan was bullying her, belittling her work ethic and causing other employees to treat her differently.

7

47.     Plaintiff Wilson told Garber that she called Defendant JPM's Employee Assistance Program ("EAP") for assistance, which referred her to a therapist to help her cope with the hostility.

48.     Garber told Plaintiff Wilson that she was escalating her complaint to Employee Relations and that Barrak Green, Vice-President of Employee Relations ("Green"), would be in touch to investigate her complaints.

49.     Plaintiff Wilson finally heard from Green on April 11, 2017, after waiting six (6) days at home while on sick leave.

50.     Plaintiff Wilson explained all of her concerns about Jensen and Jarnigan to Green through a constant stream of tears and managing a panic attack.

51.     Recognizing the severity of the situation, Green said he would escalate Plaintiff Wilson's complaints to Charity Blackburn, Vice-President, Employee Relations ("Blackburn").

52.     On or about April 14, 2017, Plaintiff Wilson learned that Jensen had docked her pay for a week when she was actually at work.

53.     On or about April 17, 2017, Plaintiff Wilson wrote to Defendant Dimon referencing "Hostile Work Environment – Audit" seeking his assistance to remediate the hostile working environment.

54.     Having followed her chain of command without success, Plaintiff Wilson believed Defendant Dimon when he said employees should contact him with problems that they have been unable to resolve.

55.     Plaintiff Wilson advised Defendant Dimon that she had been unlawfully docked one week's pay by Jensen in retaliation for having reported him and Jarnigan to Human Resources.

8

56.     She further advised Defendant Dimon of Jarnigan's texting Jensen while he was on vacation to report Plaintiff Wilson for using his office phone, which she had always been permitted to do, the negative rumors and inuendoes that Jarnigan was spreading about Plaintiff Wilson, and how she was being ostracized by her colleagues as a result.

57.     Plaintiff Wilson even mentioned how she had contacted Garber to report the negative rumors, the sabotaging of her relationships and how Jarnigan was using Jensen's vacation as an opportunity to further harass Plaintiff Wilson and treat her as a waitress/servant.

58.     Plaintiff Wilson concluded her letter by stating "In conclusion, I have two options available to me and they do not help my sanity.  My first option is to take 'short term disability' and my second option is to return to work and continue to be tortured, degraded and humiliated."

59.     On or about April 17, 2017, Plaintiff Wilson returned to work and spent most of the day in the bathroom crying, praying, and throwing up following her review of an email sent on that date from Cherie Niswonger, Vice-President of Employee Relations, ("Niswonger"), to Jensen where she advised him that Plaintiff Wilson had notified Defendant Dimon that Jensen docked her pay, and that Niswonger, without Plaintiff Wilson's authorization, told Jensen that she suffered from anxiety.

60.     Plaintiff Wilson was in a panic that Jensen's otherwise demeaning attitude toward her would now become outright hostile since learning that Plaintiff Wilson notified Defendant Dimon of the docked pay.

61.     On or about April 18, 2017, Plaintiff Wilson did return to work but left work early due to concerns that Jensen would retaliate against her and her overall concern that Employee Relations, instead of assisting her with the hostile environment, was exacerbating it.

C. **Plaintiff Wilson Takes A Medical Leave Of Absence**

62.    On or about April 19, 2017, Plaintiff Wilson was admitted to the Hospital with chest pains, high blood pressure and breathing issues.

63.    On or about April 20, 2017, Plaintiff Wilson was transferred to the Hospital's psychiatric unit on suicide alert.

64.    On or about April 24, 2017, Jensen denied Plaintiff Wilson's request for additional sick days requiring that she request emergency vacation from Garber.

65.    On or about April 24, 2017, Plaintiff Wilson wrote a second letter to Defendant Dimon, referencing "April 24th – Secretarial Town Hall," again requesting his assistance and guidance.  She referenced that it was "Administrative Assistant Day" and she learned that he again promised in the secretarial town hall that if a Defendant JPM employee sees something they should say something and he would provide support and follow the emails until the matter is resolved.  Plaintiff Wilson referenced Defendant Dimon's closing statement that he cannot help an employee if he does not know the situation exists.

66. Specifically, Plaintiff Wilson wrote in her April 24, 2017 letter:

> My job is my life and I need help!  I am confused because I thought I was doing the right thing but I keep getting the wrong results.  I need some guidance.  You said copy you so I am!  You said email you and I did!  What's next?  No one is working to help me, everyone is working to cover up or manipulate the facts.  Once I exhaust my vacation time I will be back in the office.  I wake up every morning at 4:30 a.m. wanting to come to work.  My therapist keeps telling me this environment is not healthy for me.  JPMorgan is my life and I want my life back.  I am not a lazy person and I am not sick so I don't need to take short term disability.  I need a healthy work environment.  Please help!

67.    On or about June 5, 2017, Plaintiff Wilson's disability leave of absence was declined by Defendant JPM, but reinstated for thirty (30) days by June 9, 2017 after Dr. Daniel Conti, Defendant JPM's Global Employee Assistance & Worklife Program Manager, ("Conti")

spoke with Plaintiff Wilson's therapist who explained that Plaintiff Wilson could not be returned to the same situation without risking a relapse.

### D. **Plaintiff Wilson's Attempts To Return To Work Are Thwarted By Defendant JPM**

68.    Plaintiff Wilson declined Defendant JPM's offer that she extend her disability leave for thirty (30) more days as she was ready to return to work as of July 7, 2017.

69.    Clarissa Ramos-Cafarelli, Managing Director of Employee Relations, ("Ramos-Cafarelli") was assigned as Plaintiff Wilson's contact and represented that a team of recruiters would be working with Plaintiff Wilson to find her a new position.

70.    Plaintiff Wilson shared with Ramos-Cafarelli all of her phone texts, emails, history and names of employees who had witnessed Jarnigan's hostile treatment of her to assist with the investigation into Plaintiff Wilson's complaints, which, upon information and belief, never was initiated.

71.    On or about July 7, 2017, Plaintiff Wilson wrote her third letter to Defendant Dimon with a copy to Ramos-Cafarelli referencing "Conspiracy Theory" indicating that she had declined to extend her disability leave and inquiring where she should report.  Plaintiff Wilson stated, in pertinent part:

> It is truly a disgrace to see that after 20 years of service that JPMorgan was allowed to violate, bully, belittle and humiliate me and think it is ok. Abraham Lincoln freed the slaves.  My 20 years of service anniversary date has passed.  If I was white you would have contacted me or at least emailed my employee recognition gifts to my home.
>
> Clarissa – I called you to tell you that I was being honored at the grand opening of the Shani Baraka's Women Center in Newark and that I was asked to do an interview regarding my success story.  I also asked you if I needed clearance from JPM Compliance.   You asked me, what does JPMorgan have to do with it?  I told you JPMorgan is a part of my story.

72.    Plaintiff Wilson went on to state that:

> JPMorgan classified my Depression, Anxiety Attacks, High Blood Pressure, Suicide Watch as "Employee Own Illness" on your short-term disability forms – really ok!
>
> January my performance review was Meets +.  Are you insinuating that I woke up on April 4th and came to work and had an anxiety attack for no reason?

73.    On or about July 12, 2017, Plaintiff Wilson returned to work without a specific assignment.

74.    By July 24, 2017, Plaintiff Wilson had yet to hear from anyone from the team of recruiters referenced by Ramos-Cafarelli.  Instead, she was working with Defendant JPM"s helpdesk to activate her personal computer so she could receive and respond to internal emails in an attempt to find a position on her own.

75.    On or about August 10, 2017, Plaintiff Wilson sent a fourth letter to Defendant Dimon referencing "Racism at its best," which was a follow-up to a telephone conversation she had on that day with Conti and a member of JPMorgan's security.

76.    In that letter, Plaintiff Wilson stated to Defendant Dimon, in pertinent part:

> Please stop harassing me.  Please stop judging me by the color of my skin and start respecting me as a person, a black woman who spoke up regardless of the consequences.  As I have said on numerous occasions, I understand that everyone involved in this racist situation works for JPMorgan and I am the underdog.  I get it, you are not trying to help me. If you were trying to help me or keep me employed, I would not be sitting at home.  Clarissa told me approximately one month ago that a recruitment team would be in touch to help me find a new position within JPMorgan, to date, I have not had one interview via phone or in person.  I have worked with JPMorgan for 20+ years with Meets plus performance reviews and JPMorgan can't find a new position?   WOW that is surprising.
>
> It is clear that JPMorgan does not have good intentions in this "Discriminatory situation."

77.    Plaintiff Wilson further referenced JPMorgan's security stunt where she was

portrayed as an "angry black person" who was a threat to herself and others, clarifying that she

was incapable of harming anyone, even herself, despite her prior suicidal ideations.

78.     Plaintiff Wilson concluded her letter by stating:

> Meeting with Clarissa of Employee Relations and speaking with Dr. Dan
> Conti (JPMorgan's doctor), pleading for clarity and guidance the only
> answer you can give me is a call from security?  Audit of JPMorgan is a
> racist department and what has happened to me is despicable.  You speak
> of diversity and the Officers you have running your firm are on a different
> page and time zone.  Modern day racism is in full effect at JPMorgan.

> The bottom line to this situation is disappointing and I am appalled.  For
> four months, at the hands of JPMorgan, I have suffered mentally,
> emotionally and physically.  I have been violated medically, emotionally
> destroyed, humiliated as a human being and my life is ruined.

79.     In response to Plaintiff Wilson's request for help, on or about August 23, 2017,

she received a severance agreement, which she viewed as a slap in her face after twenty years

with Defendant JPM, during which time she never took lunch, had an outstanding record, and

was never reprimanded.

80.     Defendant JPM was waiting for Plaintiff Wilson to resign as no one from the

"team of recruiters" referenced by Ramos-Cafarelli had contacted her during the prior two (2)

months to assist with finding her a position at Defendant JPM.

81.     By September 12, 2017, Plaintiff Wilson was an employee without a job and not

contacted by HR for sixty (60) days for an interview via phone or in person.

82.     In a letter, dated October 11, 2017, referencing "Whistleblower-Racism –

Separation Agreement," Plaintiff Wilson wrote Defendant Dimon for the fifth time begging for

help.  In pertinent part, she wrote:

> I wrote to you on several occasions and each time I emailed you my life
> took a turn for the worst.  I apologize for believing in you and taking up
> your time.  For some bizarre reason I think my life matters to you.
> JPMorgan failed me!

> I worked 12-14 hours a day for 20 years trying to prove that I was worthy and that I deserved the job I had. I was raised by parents who explained to me that I was born with two strikes against me (I am black and I am a woman) so I worked harder to excel. I experienced racism from the day I joined JPMorgan but it was different. It was called undercover racism. I was respected by people who did not judge me by the color of my skin. My work performance superseded my race.

83.    Plaintiff Wilson recounted the prior seven (7) months when she was hospitalized on April 12th, her disability extension was declined by Defendant JPMorgan on June 5th, her disability was reinstated on June 9th but only after Conti spoke with her therapist, she returned to Defendant JPM without a job on July 12th, remained without a job on August 12th, was handed a separation agreement on September 12th since she was still without a job, and by October 11, 2017, she was scheduled to be terminated on November 1, 2017 if she failed to find another position or refused to sign the separation agreement.

84.    Plaintiff Wilson could not understand how her career had taken such a negative turn.

85.    In a second letter, dated October 11, 2017, referencing "Three Strikes Against Me" – Plaintiff Wilson wrote Defendant Dimon for the sixth time stating, in pertinent part:

> You gave me the strength to speak up against my better judgment. My question is why? You said you would not tolerate black employees being treated differently and what has happened and is still happening to me is the opposite of what you preach.
>
> I have three strikes against me. I am Black, I am 55 years of age, and I do not have a degree. You are probably saying why is this my problem? Well it is your problem because JPMorgan allowed me to win. I went above and beyond the call of duty to make sure that every Officer that I supported was successful. I worked long hours and I watched white secretaries graduate to areas where I should have been allotted the opportunity. I accepted this disadvantage with a smile and with grace.
>
> I was good enough to back up Senior Executive Administrative Assistants but I was never the right color to be one. My salary represents the position

but my title does not.  How many black Senior Executive Assistants do you have in Audit?  Zero and not because they are not qualified but because they are black.  T.A. has had several conversations with HR regarding a title change with no avail.

People are scared to speak up because they do not want to end up like me, fired on unemployment with no resolution.  C.P. had been with the firm for years and trained the (non-African American) person she now reports to and this is blatant discrimination.  This behavior should be unacceptable.

Since you did not help me, please help the black employees who are resigning because they don't have a voice. K. within Audit is now home on disability because she suffered verbal abuse from a white officer.

Your Employee Relations team are not working to fix the problem.  They are working to cover it up.  A non-black employee started JPMorgan working as my back-up and within two years of service versus my nine years of service, she was promoted to Vice President making over $250,000 a year.  Question of the year what made her different than me? Not her skill set but the color of her skin.

I emailed you five letters trying to save my own life/job and my emails have been ignored or used to try to intimidate me.  I have been humiliated beyond repair  and the discrimination is still growing.

86.    In an email, dated November 3, 2017, Plaintiff Wilson was told that she needed to present for a fitness for duty evaluation and, in advance, submit a complete set of her medical/treatment records that precipitated or related to the condition prompting her disability leave of absence and any condition or status of her condition since then up to the present time, including, without limitation, records related to any hospitalizations, treatment sessions, diagnoses, prognoses, medications, treatment plans or status records since April 2017.

87.    In a letter, dated November 8, 2017, Plaintiff Wilson wrote Defendant Dimon for the seventh time with the subject heading "Violation of Medical Rights/Separation Agreement to Close EEOC Complaint."

88.     Plaintiff Wilson asked Defendant Dimon if he would allow his daughter to surrender all of her medical records and shared a voice message from the doctor saying he had no idea why Defendant JPM was calling him to evaluate Plaintiff Wilson.  She concluded this letter with "More humiliation and harassment!"

89.     In an email, dated November 9, 2017, Defendant JPM's legal counsel advised Plaintiff Wilson that she was required to submit to the fitness for duty examination in light of statements she made regarding harming herself and another Defendant JPM employee, as well as concerns from her medical provider about the effects on her well being on her returning to work.

90.     In fact, any threats Plaintiff Wilson made to her own well-being had been resolved months before, and she never threatened a Defendant JPM employee.

91.     As for her medical provider's concerns about Plaintiff Wilson returning to work, these involved Defendant JPM's failure to remediate the hostile working environment and its refusal to find her a suitable position during the months since her release from a disability leave of absence.

92.     There was no need to subject Plaintiff Wilson to a fitness for duty examination other than to further harass her, all of which was borne out by Defendant JPM's medical provider, who on or about December 8, 2017, found her fit for duty and not a threat to any Defendant JPM employee or herself.

93.     On or about December 28, 2017, Plaintiff Wilson was asked to meet with Galit Pearlman of Recruiting ("Pearlman"), who was to assist in finding her a new position at Defendant JPM.

94.     As a result of being sick, Plaintiff Wilson attempted to cancel the meeting but was unable to reach Pearlman.

95.     Plaintiff Wilson traveled to New York to meet Pearlman in zero degree weather only to find out after several telephone calls trying to locate Pearlman that Pearlman intended for them to speak on the telephone, not meet in person.

96.     In an email to Defendant Dimon, dated December 29, 2017, Plaintiff Wilson recounted this humiliating situation stating, in part, "How dare JPMorgan continue to humiliate and degrade me!  This nonsense needs to stop immediately!  This is emotional and mental abuse. I am trying to keep myself together but JPMorgan keeps pouring salt in a wound that I am trying to heal.  JPMorgan destroyed every holiday in 2017 for me and took away my bonus and increase for 2018.  Please don't ruin my New Year.  Thanks to JPMorgan I cannot say Happy New Year as I am not happy and will not be happy until JPMorgan stops tormenting me for not signing the Separation Agreement."

97.     In or about February 2018, Defendant JPM was told in no uncertain terms that Plaintiff Wilson was not going to resign her employment, was not going to sign the separation agreement, was not going to accept disability leave, but that she did want to return to work in a position which was comparable to the salary, responsibilities and location where she had most recently worked.

98.     In a letter, dated February 3, 2018, to Defendant Dimon referencing "JPMorgan's Retaliation has turned to insults," she recounted how Tara Griffin, Defendant JPM's legal counsel ("Griffin") spoke of her derisively when she indicated her desire to return to work rather than take a separation package.

99.     Plaintiff Wilson repeated in her letter many of the themes she had written to Defendant Dimon over the prior year such as the disparate treatment of Black employees as compared to their non-Black colleagues; the humiliation she suffered which was never

remediated by Defendant JPM's Human Resources representatives, and, to again, request his assistance to return as a valuable member of Defendant JPM's community rather than face termination as had been repeatedly threatened over the prior year.

100.    On or about March 9, 2018, Plaintiff Wilson was offered a non-competitive position, which was several levels below her prior grade and reporting to an individual with whom she had had difficulties in the past.

101.    Plaintiff Wilson did not want to accept a demotion nor did she want to return to a potentially hostile work environment, an explanation which Defendant JPM gave no credence despite knowing that the basis for Plaintiff Wilson's medical leave of absence was due to a hostile working environment.

102.    Plaintiff Wilson was then sent on a series of interviews for positions selected by Defendant JPM which were clearly beneath her experience and expertise.

103.    In fact, those interviewing her expressed dismay that she was even sent on these interviews, causing Plaintiff Wilson to question Defendant JPM's good faith commitment to having her return to work.

104.    The next series of interviews were for positions selected by Plaintiff Wilson.

105.    While she received positive feedback from many of those interviewing her and was even advised that she would be perfect for one of the positions, she was never chosen due to Defendant JPM's representation that she "lacked enthusiasm."

106.    When questioned about what "lack of enthusiasm" meant, Plaintiff Wilson was told that she did not ask enough questions or show sufficient interest in the positions, assertions which Plaintiff Wilson strongly denied.

107.   In a letter, dated May 24, 2018, from Garber, Plaintiff Wilson was told that her employment would terminate effective May 29, 2018 if she was unable to find a position with Defendant JPM or if she was not retained in an unpaid status.

108.   Effective May 29, 2018, having received no information from Defendant JPM to the contrary, Plaintiff Wilson believed her employment had terminated.

109.   Plaintiff Wilson applied for and began to receive unemployment compensation benefits.

**E. Plaintiff Wilson Is Charged With Fraud**

110.   In an email, dated June 14, 2018, Plaintiff Wilson was advised by the New York State Department of Labor ("DOL") that she was being charged with fraud based on Defendant JPM telling the DOL that Plaintiff Wilson had not been terminated on May 29, 2018.

111.   Defendant JPM referenced additional pay checks issued to Plaintiff Wilson to support its opposition to Plaintiff Wilson's receipt of unemployment compensation benefits.

112.   Plaintiff Wilson believed that the monies from Defendant JPM were for any accrued, but unused personal time off, not for salary since her employment had terminated.

113.   Despite having not advised Plaintiff Wilson, Defendant JPM claimed that Plaintiff Wilson's employment terminated as of June 14, 2018.

114.   As a result of Defendant JPM's deliberate actions to further harass Plaintiff Wilson, she was now defending herself against charges of fraud, further exacerbating the emotional and physical pain and suffering, but now with the added stress of no income.

**FIRST COUNT**
**(NJLAD – Racially Hostile Work Environment)**

115.   Plaintiff Wilson repeats the previous allegations as set forth at length herein.

116.    Plaintiff Wilson was subjected to a hostile work environment based on her race –
African American.

117.    Defendants knew or should have known about the racially hostile working
environment, but failed to take remedial action.

118.    Plaintiff Wilson notified and objected to various managers of Defendants' racially
hostile working environment, but no manager took appropriate remedial action.

119.    The racially hostile working environment that existed at Defendants was continual
since Plaintiff Wilson began her employment with Defendants in violation of the NJLAD.

120.    As a direct and proximate result of Defendants' unlawful conduct, as set forth
herein, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and
other financial losses.

121.    As a direct and proximate result of Defendants' actions, Plaintiff Wilson has
suffered and continues to experience pain, suffering, personal physical injury, and emotional
distress.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

a.    An award of compensatory and punitive damages;

b.    An aware of costs of action incurred herein, including expert fees;

c.    An award of attorneys' fees, including fees pursuant to NJLAD and other
applicable statutes;

d.    An award of pre-judgment and post-judgment interest as provided by law; and

e.    Such other and further legal and equitable relief as this Court deems necessary,
just and proper.

## SECOND COUNT
### (NJLAD – Race Discrimination)

122.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

123.    As described more fully herein, Defendants and others have engaged in a continuing pattern and practice of disparate treatment and discrimination against Plaintiff Wilson as a result of her race, African American, by paying her less, denying her promotions, and other opportunities provided to non-African American employees.

124.    Defendants' non-African American managers were free to discriminate against Plaintiff Wilson as a result of her race, African American, without fear of discipline from Defendants.

125.    Defendants failed to properly train their managers regarding compliance with anti-discrimination policies.

126.    Defendants failed to make an unequivocal commitment from the top of the organization to anti-discrimination policies as not just words but backed up by consistent practice.

127.    Defendants failed to protect Plaintiff Wilson from discrimination in the workplace.

128.    Defendants negligently, recklessly, and/or intentionally failed to take prompt, appropriate, and/or reasonable remedial steps to prevent, stop, and/or remedy the discrimination aimed at Plaintiff Wilson as a result of her race, African American.

129.    As a direct and proximate result of Defendants' unlawful conduct, as set forth herein, Plaintiff Wilson has sustained damages.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

a.  An award of compensatory and punitive damages;

b.  An aware of costs of action incurred herein, including expert fees;

c.  An award of attorneys' fees, including fees pursuant to NJLAD and other

   applicable statutes;

d.  An award of pre-judgment and post-judgment interest as provided by law; and

e.  Such other and further legal and equitable relief as this Court deems necessary,

   just and proper.

## THIRD COUNT
### (NJLAD – Retaliation)

130.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

131.    Plaintiff Wilson engaged in activities protected from reprisal under the NJLAD.

132.    Plaintiff Wilson's protected acts include, without limitation, her repeated
complaints that she was subjected to racially hostile working environment.

133.    Defendants retaliated against Plaintiff Wilson by, inter alia, perpetuating a racially
hostile work environment, failing to find her a position within Defendant JPM after twenty years
of exemplary service and, instead, offering her a separation agreement, and subjecting her to a
fitness for duty examination under the guise that she was an "angry black woman" who
threatened violence against a Defendant JPM employee, all with the disincentive for Plaintiff
Wilson to remain employed by Defendant JPM.

134.    In further retaliation, Defendants allowed Plaintiff Wilson to believe that her
employment was terminated on May 29, 2018 at which time she applied for unemployment
compensation benefits only to then be charged with fraud because of Defendants' representation
that her employment had been terminated as of June 14, 2018.

135.    Defendants violated the NJLAD when they terminated Plaintiff Wilson's employment in retaliation for her protected acts of complaining and/or objecting to discrimination and a hostile working environment.

136.    As a result of Defendants' actions, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

a.   An award of compensatory and punitive damages;

b.   An aware of costs of action incurred herein, including expert fees;

c.   An award of attorneys' fees, including fees pursuant to NJLAD and other applicable statutes;

d.   An award of pre-judgment and post-judgment interest as provided by law; and

e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## FOURTH COUNT
### (Intentional Infliction of Emotional Distress)

137.    Plaintiff Wilson repeats the previous allegations as if set forth herein.

138.    Defendants engaged in extreme and outrageous conduct directed at Plaintiff Wilson.

139.   Defendants were aware of Plaintiff Wilson's emotional state as a result of the hostile working environment and discrimination she experienced while employed at Defendant JPM.

140.   Nonetheless, Defendants acted intentionally and/or recklessly in a deliberate disregard of a high degree of probability that emotional distress would follow.

141.   As a result of these actions and misconduct, Plaintiff Wilson suffered severe emotional distress.

142.   As a result of Defendants' actions, Plaintiff Wilson has experienced and continues to experience pain, suffering, emotional distress and physical injury.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

    a.  An award of compensatory and punitive damages;

    b.  An aware of costs of action incurred herein, including expert fees;

    c.  An award of attorneys' fees, including fees pursuant to NJLAD and other applicable statutes;

    d.  An award of pre-judgment and post-judgment interest as provided by law; and

    e.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## FIFTH COUNT
### (Negligent Infliction of Emotional Distress)

143.   Plaintiff Wilson repeats the previous allegations as if set forth herein.

144.   Defendants were aware of Plaintiff Wilson's emotional state as a result of the hostile working environment and discrimination she experienced while employed at Defendant JPM.

145.   Nonetheless, Defendants acted negligently in their disregard of the high degree of probability that emotional distress would follow.

146.   As a result of these actions and misconduct, Plaintiff Wilson suffered severe emotional distress.

147.   As a result of Defendants' actions, Plaintiff Wilson has experienced and continues to experience pain, suffering, emotional distress and physical injury.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

    a.   An award of compensatory and punitive damages;

    b.   An aware of costs of action incurred herein, including expert fees;

    c.   An award of attorneys' fees, including fees pursuant to NJLAD and other applicable statutes;

    d.   An award of pre-judgment and post-judgment interest as provided by law; and

    e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## SIXTH COUNT
### (Individual Liability – NJLAD)

148.    Plaintiff Wilson repeats the allegations as if set forth herein.

149.    Defendant Dimon aided and abetted the discriminatory conduct of Defendant JPM.

150.    As result of this conduct, Defendant Dimon is liable as an individual under the NJLAD.

151.    As a result of Defendants' actions, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial damages.

152.    As a further result of Defendants' actions, Plaintiff Wilson has suffered and continues to suffer emotional pain, suffering, and loss of enjoyment of life.

WHEREFORE, Plaintiff Wilson prays for relief as follows:

    a.   An award of compensatory and punitive damages;

    b.   An aware of costs of action incurred herein, including expert fees;

    c.   An award of attorneys' fees, including fees pursuant to NJLAD and other applicable statutes;

    d.   An award of pre-judgment and post-judgment interest as provided by law; and

    e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

> **NIEDWESKE BARBER LLC**
> Attorneys for Plaintiff Wilson
>
>
> By:\_\_\_ /s/ Linda Niedweske_____
>         Linda J. Niedweske

Dated: August 1, 2018

## JURY DEMAND

Plaintiff Wilson demands trial by jury on all issues.

> **NIEDWESKE BARBER LLC**
> Attorneys for Plaintiff Wilson
>
>
> By: \_\_\_ /s/ Linda Niedweske_____
>         Linda J. Niedweske

Dated: August 1, 2018

## DESIGNATION OF TRIAL ATTORNEY

Linda J. Niedweske is hereby designated as trial counsel in the within matter.

> **NIEDWESKE BARBER LLC**
> Attorneys for Plaintiff Wilson
>
>
> By: \_\_\_ /s/ Linda Niedweske_____
>         Linda J. Niedweske

Dated: August 1, 2018

<u>**CERTIFICATION PURSUANT TO R. 4:5-1**</u>

I, Linda J. Niedweske, certify as follows:

I am a partner in the Law Firm of Niedweske Barber LLC, attorneys for Plaintiff Wilson in the above-entitled action.  To the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or arbitration proceeding, no other action or arbitration proceeding is contemplated, and no other parties should be joined in this action.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**NIEDWESKE BARBER LLC**
Attorneys for Plaintiff Wilson


By: ___/s/ Linda Niedweske_____
         Linda J. Niedweske

Dated: August 1, 2018

# Civil Case Information Statement

## Case Details: ESSEX | Civil Part Docket# L-005407-18

**Case Caption:** WILSON WANDA  VS JPMORGAN CHASE

**Case Initiation Date:** 08/01/2018

**Attorney Name:** JESSICA L MARICONDA

**Firm Name:** NIEDWESKE BARBER LLC

**Address:** 98 WASHINGTON ST

MORRISTOWN NJ 07960

**Phone:**

**Name of Party:** PLAINTIFF : Wilson, Wanda

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

 **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

 **If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

08/01/2018

Dated

/s/ JESSICA L MARICONDA

Signed