Linda J. Niedweske – Attorney ID No. 030391988
Jessica L. Mariconda – Attorney ID No.  018432011
NIEDWESKE BARBER LLC
98 Washington Street
Morristown, New Jersey 07960
*Phone:   (973) 401-0064*
Fax:       (973) 401-0061
www.n-blaw.com
Attorneys for Plaintiff Wanda Wilson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WANDA WILSON,<br><br>                           Plaintiff,<br>v.<br><br>JPMORGAN CHASE BANK N.A.,<br>JAMIE DIMON, individually and in his<br>official capacity, JANE and/or JOHN<br>DOES 1-10, and XYZ  Entities 1 to 10.<br><br>                           Defendants. | CASE NO.: 2:18-CV-13789-JMV-JBC<br><br>AMENDED COMPLAINT AND<br>JURY DEMAND |

Plaintiff Wanda Wilson, through her attorneys Niedweske Barber LLC, by way of

Complaint against Defendants JPMorgan Chase Bank, N.A. ("JPM"), Jamie Dimon, in his

individual and official capacity ("Dimon"), Jane and/or John Does 1-10, and XYZ Entities 1-10

(collectively referred to as "Defendants"),

**PARTIES**

1.   Plaintiff Wilson is a New Jersey citizen residing at 15 Martin Lane, Township of

Piscataway, County of Middlesex, and State of New Jersey.

2.   During all times relevant to this Complaint, Plaintiff Wilson was an employee of

Defendant JPM as the term "employee" is defined by the New York State Human Rights Law

("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

3.       Defendant JPM is one of the oldest financial institutions in the United States and presently a leading global financial services firm with assets of $2.6 trillion, a presence in over 100 markets, and over 250,000 employees serving millions of consumers, small business, and many of the world's most prominent corporate, institutional and government clients.  Defendant JPM is also a leader in investment banking, financial services for consumers and small business, commercial banking, financial transaction processing and asset management.

4.       During all times relevant to this Complaint, Defendant JPM has been an "employer" as the term is defined by the NYSHRL and NYCHRL.

5.       During all times relevant to this Complaint, Defendant JPM has acted and continues to act through its entities, employees, agents, agencies, departments and divisions.

6.       Since December 31, 2006, Defendant Dimon has been and continues to be the Chairman of the Defendant JPM Board and, since December 31, 2015, he has been Chief Executive Officer and President of the Defendant JPM.  Defendant Dimon was President and Chief Operating Officer following Defendant JPM's merger with Bank One Corporation in July 2004.

7.   During all times relevant to this Complaint, Defendant Dimon, as a member of upper management with an ownership interest in Defendant JPM, had the authority to hire and fire employees and aided and abetted Defendant JPM's violation of Plaintiff Wilson's rights protected by the NYSHRL and NYCHRL.

8.   John and/or Jane Doe(s) are fictitious designations given to currently unknown individuals who may be joined to this case as party defendant(s).

9.   XYZ Entities is a fictitious designation given to currently unknown entity(ies) that may be joined to this case as party defendant(s).

## VENUE

10.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship and amount in controversy.

## STATEMENT OF FACTS

### A. Plaintiff Wilson's Twenty Years of Exemplary Employment With Defendant JPM

11.     Plaintiff Wilson, an African American woman, began her employment with Defendant JPM in or about 1997 and was terminated in or about May/June 2018 when she held the position of Executive Administrative Assistant.

12.     As an Executive Administrative Assistant, Plaintiff Wilson provided administrative support for Defendant JPM senior officers and back-up support in Defendant JPM's New York City executive offices where Defendant Dimon's office was located.

13. Throughout her employment with Defendant JPM, Plaintiff Wilson received meets or exceeds expectations on her performance reviews and she was never reprimanded or disciplined.

14.     Plaintiff Wilson was considered an exemplary employee who was respected by Defendant JPM upper management, her colleagues, and any member of the Defendant JPM community with whom she interacted.

15.     In or about 2003, when Plaintiff Wilson's sister was brutally murdered by Plaintiff Wilson's ex-husband, Defendant JPM supported her throughout this ordeal by providing her with emotional and moral support.

16.     Defendant JPM even paid for Plaintiff Wilson to stay at a hotel while her home was a crime scene.

3

17.     Plaintiff Wilson returned this support by her dedication as evidenced by her arriving to work at 7:30 a.m. each day, not taking lunch, normally leaving at 7:30 p.m. and, as needed, staying until anywhere from 9:30 p.m. to midnight to prepare for board meetings or other projects.

18.     Plaintiff Wilson attended Defendant JPM Town Halls where she heard Defendant Dimon repeatedly tell Defendant JPM employees that he reads every email and he should be contacted if there are any issues which an employee has been unable to resolve.

19.     Defendant Dimon further stated that he cannot provide assistance if he is not aware of the problem.

20.     For the twenty (20) years of Plaintiff Wilson's employment, Defendant JPM played a major and substantial role in her life and how she defined herself.

21.     As an African American woman, who was fifty-five (55) years old in 2017 and never graduated college, Plaintiff Wilson was proud of her accomplishments at Defendant JPM.

22.     Over the years, Plaintiff Wilson noticed the disparity in the terms and conditions of employment at Defendant JPM between African American employees and their non-African American counterparts, including promotional opportunities, compensation and other perquisites of Defendant JPM employment.

23.     Plaintiff Wilson never spoke out about these disparities publicly or filed internal complaints as she had seen other African American employees who objected to Defendant JPM's discriminatory practices face adverse consequences.

24.     As her reward for not speaking out, Plaintiff Wilson was the only African American employee who worked in the executive office suite because, as she was told, she was not like the others, meaning her African American colleagues.

25.     The racial disparity at Defendant JPM was so well known that, in or about August

2017, Defendant Dimon felt compelled to address the issue when in an interview he stated:

> JPMorgan is also 'making a special effort' to bring on more African-
> Americans by setting up a separate group to focus on school recruiting,
> retention and hiring 'more senior African-American talent. It's starting to
> work. The numbers are getting better and it's different. We have to
> acknowledge the reason it's different is it's a different history, a different
> background. A lot of African Americans didn't grow up in the same
> neighborhood as white people. We're doing great with women, we're
> doing great with Asians, we're doing great with Hispanics. We've got to
> do better with African Americans and we're going to.

26.     Plaintiff Wilson believed in Defendant Dimon's sincerity and believed that he

was committed to resolving the racial disparity within Defendant JPM.

### B. **Plaintiff Wilson Is Subjected To A Hostile Working Environment.**

27.     In or about March 2016, Plaintiff Wilson was assigned as the Executive

Administrative Assistant for Paul Jensen ("Jensen"), Managing Director, Chief Administrative

Officer and Head of Audit.

28.     At or about this same time, Janet Jarnigan ("Jarnigan"), Executive Director, Audit

Manager, was also assigned to Jensen as Team Leader.

29.     Initially, Jensen, Jarnigan and Plaintiff Wilson worked well as a team.

30.     However, as the months progressed, Jarnigan and Jensen developed a closer

working relationship even traveling together on business.

31.     Plaintiff Wilson was no longer an integral member of this team and had been

relegated to a more subservient role.

32.     Over the next several months, the respectful tone with which Jarnigan addressed

Plaintiff Wilson had slowly deteriorated so that by December 2016, Jarnigan was ordering

Plaintiff Wilson to bring her lunch, offering Plaintiff Wilson's administrative services to

Defendant JPM consultants and third parties without checking Plaintiff Wilson's availability or if it was appropriate to even offer her services.

33.     Jarnigan's treatment of Plaintiff Wilson was dramatically different than her treatment of the non-African American Executive Administrative Assistants with whom Jarnigan worked.

34.     When Plaintiff Wilson was unable to comply with Jarnigan's orders because of more pressing work responsibilities, Jarnigan would often complain to Jensen that she was being uncooperative.

35.     As the months passed, Jarnigan became more deliberate and overt in her demeaning treatment of Plaintiff Wilson,

36.     Plaintiff Wilson complained to Jensen that Jarnigan was exceeding her authority, that she was spreading false rumors about Plaintiff Wilson to other secretaries and, in general, creating a hostile working environment.

37.     Jensen's response was that there were two sides to every story, accused Plaintiff Wilson of being "a bit dramatic" and refused to intervene.

38.     Plaintiff Wilson then filed a complaint with Samantha Garber ("Garber"), Executive Director & Head of Audit, Human Resources ("H.R."), seeking her intervention to remediate the hostile working environment.

39.     As a result of her filing a complaint with H.R., Plaintiff Wilson noticed a dramatic change in Jensen's attitude toward her in that he began questioning her work and treating her with distrust.

40.     His responses to her were terse and dismissive.

41.     Plaintiff Wilson also noticed her colleagues distancing themselves from her exacerbating the hostile work environment and causing her to feel increasingly isolated.

42.     On or about April 4, 2017, several of Plaintiff Wilson's colleagues told her that Jarnigan had been spreading false rumors about her, including that she had made one of the non-African American officers cry when she yelled at her and that she had become such a problem that Garber had reprimanded her in December 2016.

43.     Jarnigan even mockingly referred to the stack of folders between their desks as the Mexican/U.S. wall as evidence of Plaintiff Wilson's recalcitrance which, in fact, were there to create a filing system that Jensen had requested.

44.     After months of being demeaned, bullied, disrespected and relegated to a waitress, Jarnigan's campaign of mockery and attempts to discredit Plaintiff Wilson's stellar reputation were more than Plaintiff Wilson could endure and she left the office frantic and embarrassed.

45.     For the first time in her career with Defendant JPM, Plaintiff Wilson found herself treated with the same derision she had seen directed at other Defendant JPM African-American employees, who were forced to either endure the treatment to maintain their employment or speak out and face retaliation.

46.     On or about April 5, 2017, Plaintiff Wilson took a sick day and called Garber to again report the hostile work environment that Jarnigan was perpetuating by spreading false rumors and sabotaging Plaintiff Wilson's reputation.

47.     She further complained that Jarnigan was bullying her, belittling her work ethic and causing other employees to treat her differently.

48.     Plaintiff Wilson told Garber that she called Defendant JPM's Employee Assistance Program ("EAP") for assistance, which referred her to a therapist to help her cope with the hostility.

49.     Garber told Plaintiff Wilson that she was escalating her complaint to Employee Relations and that Barrak Green ("Green"), Vice-President of Employee Relations, would be in touch to investigate her complaints.

50.     Plaintiff Wilson finally heard from Green on April 11, 2017, after waiting six (6) days at home while on sick leave.

51.     Plaintiff Wilson explained all of her concerns about Jensen and Jarnigan to Green through a constant stream of tears, while attempting to fend off a panic attack.

52.     Recognizing the severity of the situation, Green said he would escalate Plaintiff Wilson's complaints to Charity Blackburn ("Blackburn"), Vice-President, Employee Relations.

53.     On or about April 14, 2017, Plaintiff Wilson learned that Jensen had docked her pay for a week when she was actually at work.

54.     On or about April 17, 2017, Plaintiff Wilson wrote to Defendant Dimon referencing "Hostile Work Environment – Audit" seeking his assistance to remediate the hostile working environment.

55.     Having followed her chain of command without success, Plaintiff Wilson followed Defendant Dimon's instructions that employees should contact him with problems that they have been unable to resolve.

56.     Plaintiff Wilson complained to Defendant Dimon that she had been unlawfully docked one week's pay by Jensen in retaliation for having reported him and Jarnigan to Human Resources.

57.    She further complained to Defendant Dimon of Jarnigan's texting Jensen while he was on vacation to report Plaintiff Wilson for using his office phone, which she had always been permitted to do, the negative rumors and inuendoes that Jarnigan was spreading about Plaintiff Wilson, and how she was being ostracized by her colleagues as a result.

58.    Plaintiff Wilson even complained about how she had contacted Garber to report the negative rumors, the sabotaging of her relationships and how Jarnigan was using Jensen's vacation as an opportunity to further harass Plaintiff Wilson and treat her as a waitress/servant.

59.    Plaintiff Wilson concluded her letter by stating "In conclusion, I have two options available to me and they do not help my sanity.  My first option is to take 'short term disability' and my second option is to return to work and continue to be tortured, degraded and humiliated."

60.    On or about April 17, 2017, Plaintiff Wilson returned to work and spent most of the day in the bathroom crying, praying, and throwing up following her review of an email sent on that date from Cherie Niswonger ("Niswonger"), Vice-President of Employee Relations, to Jensen where she advised him that Plaintiff Wilson had complained to Defendant Dimon that Jensen docked her pay, and, without Plaintiff Wilson's authorization, told Jensen that she suffered from anxiety.

61.    Plaintiff Wilson was in a panic that Jensen's already demeaning attitude toward her would now become outright hostility since learning that Plaintiff Wilson complained to Defendant Dimon of the docked pay.

62.    On or about April 18, 2017, Plaintiff Wilson did return to work but left work early due to concerns that Jensen would retaliate against her and her overall concern that Employee Relations, instead of assisting her with the hostile environment, was exacerbating it.

C. **Plaintiff Wilson Takes A Medical Leave Of Absence**

63.     On or about April 19, 2017, Plaintiff Wilson was admitted to the Hospital with chest pains, high blood pressure and breathing issues.

64.     On or about April 20, 2017, Plaintiff Wilson was transferred to the Hospital's psychiatric unit on suicide alert.

65.     On or about April 24, 2017, Jensen denied Plaintiff Wilson's request for additional sick days requiring that she request emergency vacation from Garber.

66.     On or about April 24, 2017, Plaintiff Wilson wrote a second letter to Defendant Dimon, referencing "April 24th – Secretarial Town Hall," again requesting his assistance and guidance.  She referenced that it was "Administrative Assistant Day" and she learned that he again promised in the secretarial town hall that if a Defendant JPM employee sees something they should say something and he would provide support and follow the emails until the matter is resolved.  Plaintiff Wilson referenced Defendant Dimon's closing statement that he cannot help an employee if he does not know the situation exists.

67. Specifically, Plaintiff Wilson wrote in her April 24, 2017 letter:

> My job is my life and I need help!  I am confused because I thought I was doing the right thing but I keep getting the wrong results.  I need some guidance.  You said copy you so I am!  You said email you and I did!  What's next?  No one is working to help me, everyone is working to cover up or manipulate the facts.  Once I exhaust my vacation time I will be back in the office.  I wake up every morning at 4:30 a.m. wanting to come to work.  My therapist keeps telling me this environment is not healthy for me.  JPMorgan is my life and I want my life back.  I am not a lazy person and I am not sick so I don't need to take short term disability.  I need a healthy work environment.  Please help!

68.     On or about June 5, 2017, Plaintiff Wilson's disability leave of absence was declined by Defendant JPM, but reinstated for thirty (30) days by June 9, 2017 after Dr. Daniel

Conti ("Conti"), Defendant JPM's Global Employee Assistance & Worklife Program Manager, spoke with Plaintiff Wilson's therapist who explained that Plaintiff Wilson could not be returned to the same situation without risking a relapse.

### D. Plaintiff Wilson's Attempts To Return To Work Are Thwarted By Defendant JPM

69.     Plaintiff Wilson declined Defendant JPM's offer that she extend her disability leave for thirty (30) more days as she was ready to return to work as of July 7, 2017.

70.     Clarissa Ramos-Cafarelli ("Ramos-Cafarelli"), Managing Director of Employee Relations, was assigned as Plaintiff Wilson's contact and represented that a team of recruiters would be working with Plaintiff Wilson to find her a new position.

71.     Plaintiff Wilson shared with Ramos-Cafarelli all of her phone texts, emails, employment history and names of employees who had witnessed Jarnigan's hostile treatment of her in order to assist with the investigation into Plaintiff Wilson's complaints, which, upon information and belief, had not previously been initiated.

72.     On or about July 7, 2017, Plaintiff Wilson wrote her third letter to Defendant Dimon with a copy to Ramos-Cafarelli referencing "Conspiracy Theory" indicating that she had declined to extend her disability leave and inquiring where she should report.  Plaintiff Wilson stated, in pertinent part:

> It is truly a disgrace to see that after 20 years of service that JPMorgan was allowed to violate, bully, belittle and humiliate me and think it is ok.  Abraham Lincoln freed the slaves.  My 20 years of service anniversary date has passed.  If I was white you would have contacted me or at least emailed my employee recognition gifts to my home.
>
> Clarissa – I called you to tell you that I was being honored at the grand opening of the Shani Baraka's Women Center in Newark and that I was asked to do an interview regarding my success story. I also asked you if I needed clearance from JPM Compliance.  You

asked me, what does JPMorgan have to do with it? I told you JPMorgan is a part of my story.

73.    Plaintiff Wilson went on to state that:

JPMorgan classified my Depression, Anxiety Attacks, High Blood Pressure, Suicide Watch as "Employee Own Illness" on your short-term disability forms – really ok!

January my performance review was Meets +. Are you insinuating that I woke up on April 4th and came to work and had an anxiety attack for no reason?

74.    On or about July 12, 2017, Plaintiff Wilson was scheduled to return to work but still had no specific assignment.

75.    By July 24, 2017, Plaintiff Wilson had yet to hear from anyone from the team of recruiters referenced by Ramos-Cafarelli. Instead, she was working with Defendant JPM's helpdesk to activate her personal computer so she could receive and respond to internal emails in an attempt to find a position on her own.

76.    On or about August 10, 2017, Plaintiff Wilson sent a fourth letter to Defendant Dimon referencing "Racism at its best," which was a follow-up to a telephone conversation she had on that day with Conti and a member of Defendant JPM's security.

77.    In that letter, Plaintiff Wilson complained to Defendant Dimon, in pertinent part:

Please stop harassing me. Please stop judging me by the color of my skin and start respecting me as a person, a black woman who spoke up regardless of the consequences. As I have said on numerous occasions, I understand that everyone involved in this racist situation works for JPMorgan and I am the underdog. I get it, you are not trying to help me. If you were trying to help me or keep me employed, I would not be sitting at home. Clarissa told me approximately one month ago that a recruitment team would be in touch to help me find a new position within JPMorgan, to date, I have not had one interview via phone or in person. I have worked with JPMorgan for 20+ years with Meets plus performance reviews and JPMorgan can't find a new position? WOW that is surprising.

It is clear that JPMorgan does not have good intentions in this "Discriminatory situation."

78.     Plaintiff Wilson further complained about Defendant JPM's security stunt where she was portrayed as an "angry black woman" who was a threat to herself and others, clarifying that she was incapable of harming anyone, even herself, despite her prior suicidal ideations.

79.     Plaintiff Wilson concluded her letter by stating:

> Meeting with Clarissa of Employee Relations and speaking with Dr. Dan Conti (JPMorgan's doctor), pleading for clarity and guidance the only answer you can give me is a call from security? Audit of JPMorgan is a racist department and what has happened to me is despicable.  You speak of diversity and the Officers you have running your firm are on a different page and time zone. Modern day racism is in full effect at JPMorgan.
>
> The bottom line to this situation is disappointing and I am appalled.  For four months, at the hands of JPMorgan, I have suffered mentally, emotionally and physically.  I have been violated medically, emotionally destroyed, humiliated as a human being and my life is ruined.

80.     In response to Plaintiff Wilson's plea for help, on or about August 23, 2017, she received a severance agreement, which she viewed as a slap in her face after twenty years with Defendant JPM, during which time she rarely took lunch, had an outstanding record, and was never reprimanded.

81.     Defendant JPM was waiting for Plaintiff Wilson to resign as no one from the "team of recruiters" referenced by Ramos-Cafarelli had contacted her during the prior two (2) months to assist with finding her a position at Defendant JPM.

82.     By September 12, 2017, Plaintiff Wilson was getting paid as an employee but without a position, having not been contacted by any Defendant JPM H.R. representatives during the prior sixty (60) days for an interview via phone or in person.

13

83.     In a letter, dated October 11, 2017, referencing "Whistleblower-Racism –

Separation Agreement," Plaintiff Wilson wrote Defendant Dimon for the fifth time begging for

help.  In pertinent part, she wrote:

> I wrote to you on several occasions and each time I emailed you
> my life took a turn for the worst.  I apologize for believing in you
> and taking up your time.  For some bizarre reason I think my life
> matters to you.  JPMorgan failed me!
>
> I worked 12-14 hours a day for 20 years trying to prove that I was
> worthy and that I deserved the job I had.  I was raised by parents
> who explained to me that I was born with two strikes against me (I
> am black and I am a woman) so I worked harder to excel.  I
> experienced racism from the day I joined JPMorgan but it was
> different.  It was called undercover racism.  I was respected by
> people who did not judge me by the color of my skin.  My work
> performance superseded my race.

84.     Plaintiff Wilson recounted the prior seven (7) months when she was hospitalized

on April 12th, her disability extension was declined by Defendant JPMorgan on June 5th, her

disability was reinstated on June 9th but only after Conti spoke with her therapist, she returned to

Defendant JPM without a job on July 12th, remained without a job on August 12th, was handed a

separation agreement on August 23rd, and by October 11, 2017, she was advised that unless she

found a position by November 1, 2017 or agreed to sign the separation agreement, her

employment would be terminated.

85.     Plaintiff Wilson could not understand how her career had taken such a negative

turn.

86.     In a second letter, dated October 11, 2017, referencing "Three Strikes Against

Me" – Plaintiff Wilson wrote Defendant Dimon for the sixth time stating, in pertinent part:

> You gave me the strength to speak up against my better judgment.
> My question is why?  You said you would not tolerate black
> employees being treated differently and what has happened and is
> still happening to me is the opposite of what you preach.

14

I have three strikes against me.  I am Black, I am 55 years of age, and I do not have a degree.  You are probably saying why is this my problem?  Well it is your problem because JPMorgan allowed me to win.  I went above and beyond the call of duty to make sure that every Officer that I supported was successful.  I worked long hours and I watched white secretaries graduate to areas where I should have been allotted the opportunity.   I accepted this disadvantage with a smile and with grace.

I was good enough to back up Senior Executive Administrative Assistants but I was never the right color to be one.  My salary represents the position but my title does not.  How many black Senior Executive Assistants do you have in Audit?  Zero and not because they are not qualified but because they are black.  T.A. [a Defendant JPM African American employee] has had several conversations with HR regarding a title change with no avail.

People are scared to speak up because they do not want to end up like me, fired on unemployment with no resolution.  C.P. [an African American Defendant JPM employee] had been with the firm for years and trained the (non-African American) person she now reports to and this is blatant discrimination.  This behavior should be unacceptable.

Since you did not help me, please help the black employees who are resigning because they don't have a voice. K. [an African American Defendant JPM employee] within Audit is now home on disability because she suffered verbal abuse from a white officer.

Your Employee Relations team are not working to fix the problem.  They are working to cover it up.  A non-black employee started JPMorgan working as my back-up and within two years of service versus my nine years of service, she was promoted to Vice President making over $250,000 a year.  Question of the year what made her different than me?  Not her skill set but the color of her skin.

I emailed you five letters trying to save my own life/job and my emails have been ignored or used to try to intimidate me.  I have been humiliated beyond repair and the discrimination is still growing.

87.    In an email, dated November 3, 2017, Plaintiff Wilson was told that she needed to

present for a fitness for duty evaluation and, in advance, "submit a complete set of her medical/treatment records that precipitated or related to the condition prompting her disability leave of absence and any condition or status of her condition since then up to the present time, including, without limitation, records related to any hospitalizations, treatment sessions, diagnoses, prognoses, medications, treatment plans or status records since April 2017."

88.     In a letter, dated November 8, 2017, Plaintiff Wilson wrote Defendant Dimon for the seventh time with the subject heading "Violation of Medical Rights/Separation Agreement to Close EEOC Complaint."

89.     Plaintiff Wilson asked Defendant Dimon if he would allow his daughter to surrender all of her medical records and referenced that she had received a voice message from the doctor who was to evaluate her fitness that he had no idea why Defendant JPM was calling him to evaluate Plaintiff Wilson.  She concluded this letter with "More humiliation and harassment!"

90.     In an email, dated November 9, 2017, Defendant JPM's legal counsel advised Plaintiff Wilson that she was required to submit to the fitness for duty examination in light of statements she made regarding harming herself and another Defendant JPM employee, as well as concerns from her medical provider about the effects on her well being on her returning to work.

91.     In actuality, any threats Plaintiff Wilson made to her own well-being had been resolved months before, and she never threatened a Defendant JPM employee.

92.     As for her medical provider's concerns about Plaintiff Wilson returning to work, these involved Defendant JPM's failure to remediate the hostile working environment and its refusal to find her a suitable position during the months since her release from a disability leave of absence.

93.     There was no need to subject Plaintiff Wilson to a fitness for duty examination other than to further harass her, all of which was borne out by Defendant JPM's medical provider, who on or about December 8, 2017, found her fit for duty and not a threat to any Defendant JPM employee or herself.

94.     On or about December 28, 2017, Plaintiff Wilson was asked to meet with Galit Pearlman ("Pearlman") of Defendant JPM's Recruiting Department, who was to assist in finding her a new position at Defendant JPM.

95.     Plaintiff Wilson attempted to cancel the meeting due to illness but was unable to reach Pearlman.

96.     Despite feeling ill, Plaintiff Wilson traveled to New York to meet Pearlman in zero degree weather only to find out after several telephone calls trying to locate Pearlman that Pearlman intended for them to speak on the telephone, not to meet in person.

97.     In an email to Defendant Dimon, dated December 29, 2017, Plaintiff Wilson complained of the humiliating situation stating, in part, "How dare JPMorgan continue to humiliate and degrade me!  This nonsense needs to stop immediately!  This is emotional and mental abuse.  I am trying to keep myself together but JPMorgan keeps pouring salt in a wound that I am trying to heal.  JPMorgan destroyed every holiday in 2017 for me and took away my bonus and increase for 2018.  Please don't ruin my New Year.  Thanks to JPMorgan I cannot say Happy New Year as I am not happy and will not be happy until JPMorgan stops tormenting me for not signing the Separation Agreement."

98.     In or about February 2018, Defendant JPM was advised that Plaintiff Wilson had no intention of resigning her employment, was not going to sign the separation agreement, was

not going to accept disability leave, but that she did want to return to work in a position which was comparable to the salary, responsibilities and location where she had most recently worked.

99.    In a letter, dated February 3, 2018, to Defendant Dimon referencing "JPMorgan's Retaliation has turned to insults," she complained that Tara Griffin ("Griffin"), Defendant JPM's legal counsel, spoke of her derisively when Plaintiff Wilson indicated her desire to return to work rather than take a separation package.

100.    Plaintiff Wilson repeated in her letter many of the themes she had written to Defendant Dimon over the prior year, such as the disparate treatment of Black employees as compared to their non-Black colleagues; the humiliation she suffered which was never remediated by Defendant JPM's H.R. representatives, and, to again, request his assistance to return as a valuable member of Defendant JPM's community rather than face termination as had been repeatedly threatened over the prior year.

101.    On or about March 9, 2018, Plaintiff Wilson was offered a non-competitive position, which was several levels below her prior grade and reporting to an individual with whom she had had difficulties in the past.

102.    Plaintiff Wilson did not want to accept a demotion nor did she want to return to a potentially hostile work environment, an explanation which was rejected by Defendant JPM, despite knowing that Plaintiff Wilson's medical leave of absence was due to a hostile working environment.

103.    Plaintiff Wilson was then sent on a series of interviews for positions selected by Defendant JPM which were clearly beneath her experience and expertise.

104.     In fact, those interviewing her expressed dismay that she was even sent on these interviews, causing Plaintiff Wilson to question Defendant JPM's good faith commitment to having her return to work.

105.     The next series of interviews were for positions selected by Plaintiff Wilson.

106.     While she received positive feedback from many of those interviewing her and was even advised that she would be perfect for one of the positions, she was never chosen due to Defendant JPM's representation that she "lacked enthusiasm."

107.     When questioned about what "lack of enthusiasm" meant, Plaintiff Wilson was told that she did not ask enough questions or show sufficient interest in the positions, assertions which Plaintiff Wilson strongly denied.

108.     In a letter, dated May 24, 2018, from Garber, Plaintiff Wilson was told that her employment would terminate effective May 29, 2018 if she was unable to find a position with Defendant JPM or if she was not retained in an unpaid status.

109.     Effective May 29, 2018, having received no information from Defendant JPM to the contrary, Plaintiff Wilson believed her employment had terminated.

110.     Plaintiff Wilson applied for and began to receive unemployment compensation benefits.

**E.  Plaintiff Wilson Is Charged With Fraud**

111.     In an email, dated June 14, 2018, Plaintiff Wilson was notified by the New York State Department of Labor ("DOL") that she was being charged with fraud based on Defendant JPM telling the DOL that Plaintiff Wilson had not been terminated on May 29, 2018.

112.     Defendant JPM referenced additional pay checks issued to Plaintiff Wilson to support its opposition to Plaintiff Wilson's receipt of unemployment compensation benefits.

113.    Plaintiff Wilson believed that the monies from Defendant JPM were for any accrued, but unused personal time off, not for salary since her employment had terminated.

114.    Defendant JPM claimed that Plaintiff Wilson's employment terminated as of June 14, 2018, a fact which was never directly conveyed to Plaintiff Wilson until after she had already filed for unemployment compensation benefits.

115.    As a result of Defendant JPM's deliberate actions to further harass Plaintiff Wilson, she was forced to defend herself against charges of fraud, which further exacerbated the emotional and physical trauma she had been experiencing during the prior year, now with the added stress of no income.

## FIRST COUNT
### (NYSHRL – Racially Hostile Work Environment)

116.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

117.    Plaintiff Wilson was subjected to a hostile work environment based on her race -- African American.

118.    Plaintiff Wilson's workplace was permeated with racially discriminatory intimidation, ridicule and insult as set forth herein.

119.    The racially hostile work environment was sufficiently severe and pervasive that it altered Plaintiff Wilson's employment and created an abusive working environment.

120.    Plaintiff Wilson filed numerous complaints about the racially hostile work environment and sought assistance from Defendant JPM upper managers, including Defendant Dimon, but no action was ever taken to remediate the hostility.

121.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

122.   As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.   An award of compensatory and punitive damages;

b.   An aware of costs of action incurred herein, including expert fees;

c.   An award of attorneys' fees, including fees pursuant to NYSHRL and other applicable statutes;

d.   An award of pre-judgment and post-judgment interest as provided by law; and

e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## SECOND COUNT
### NYCHRL – Racially Hostile Work Environment)

123.   Plaintiff Wilson repeats the previous allegations as set forth at length herein.

124.   Plaintiff Wilson was subjected to a hostile work environment based on her race -- African American -- as evidenced by the inferior terms and conditions of her employment with Defendant JPM.

125.   As set forth herein, the racially hostile work environment was sufficiently severe and pervasive that it altered Plaintiff Wilson's employment and created an abusive working environment.

126.   Plaintiff Wilson filed numerous complaints about the racially hostile work environment and sought assistance from Defendant JPM upper managers, including Defendant Dimon, but no action was ever taken to remediate the hostility.

127.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

128.    As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

    a.    An award of compensatory and punitive damages;

    b.    An aware of costs of action incurred herein, including expert fees;

    c.    An award of attorneys' fees, including fees pursuant to NYCHRL and other applicable statutes;

    d.    An award of pre-judgment and post-judgment interest as provided by law; and

    e.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## THIRD COUNT
### (NYSHRL – Race Discrimination)

129.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

130.    While employed by Defendant JPM, Plaintiff Wilson was subjected to race discrimination in light of her less experienced non-African American colleagues receiving higher pay, promotions and other opportunities which were denied to her as a member of the African American race.

131.    Defendants negligently, recklessly, and/or intentionally failed to take prompt, appropriate, and/or reasonable remedial steps to prevent, stop, and/or remedy the discrimination aimed at Plaintiff Wilson as a result of her race, African American.

132.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

133.    As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.    An award of compensatory and punitive damages;

b.    An aware of costs of action incurred herein, including expert fees;

c.    An award of attorneys' fees, including fees pursuant to NYSHRL and other applicable statutes;

d.    An award of pre-judgment and post-judgment interest as provided by law; and

e.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## FOURTH COUNT
### (NYCHRL – Race Discrimination)

134.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

135.    While employed by Defendant JPM, Plaintiff Wilson was subjected to race discrimination in light of her less experienced non-African American colleagues receiving higher pay, promotions and other opportunities which were denied to her as a member of the African American race.

136.    Defendants negligently, recklessly, and/or intentionally failed to take prompt, appropriate, and/or reasonable remedial steps to prevent, stop, and/or remedy the discrimination aimed at Plaintiff Wilson as a result of her race, African American.

137.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

138.    As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.  An award of compensatory and punitive damages;

b.  An aware of costs of action incurred herein, including expert fees;

c.  An award of attorneys' fees, including fees pursuant to NYCHRL and other applicable statutes;

d.  An award of pre-judgment and post-judgment interest as provided by law; and

e.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

<u>**FIFTH COUNT**</u>
<u>**(NYSHRL – Retaliation)**</u>

139.    Plaintiff Wilson repeats the previous allegations as set forth at length herein.

140.    Plaintiff Wilson engaged in activities protected from reprisal under the NYSHRL in that she repeatedly complained to upper managers, including Defendant Dimon, about the racially hostile and discriminatory work environment to which she was subjected.

141.    Following her complaints, Plaintiff Wilson faced increased hostility in the workplace, was subjected to unnecessary scrutiny, referred to as an "angry black woman" who posed a threat to her colleagues, offered a separation package in lieu of assistance in finding

employment, subjected to Defendant JPM's interference in her obtaining a new position, and, ultimately, charged with fraud by the NY DOL due to Defendant JPM's deliberate misrepresentation as to her termination date.

142.   Defendants violated the NYSHRL as a result of the retaliatory actions taken against Plaintiff Wilson in response to her protected acts of complaining and/or objecting to discrimination and a hostile working environment.

143.   As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

144.   As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.   An award of compensatory and punitive damages;

b.   An aware of costs of action incurred herein, including expert fees;

c.   An award of attorneys' fees, including fees pursuant to NYSHRL and other applicable statutes;

d.   An award of pre-judgment and post-judgment interest as provided by law; and

e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

### SIXTH COUNT
### (NYCHRL – Retaliation)

145.   Plaintiff Wilson repeats the previous allegations as set forth at length herein.

146.    Plaintiff Wilson engaged in activities protected from reprisal under the NYCHRL in that she repeatedly complained to upper managers, including Defendant Dimon, about the racially hostile and discriminatory work environment to which she was subjected.

147.    Following her complaints, Plaintiff Wilson was retaliated against by inter alia, (a) Jensen's increasing hostility toward her, (b) Defendants' allowing the hostile and discriminatory environment to persist by refusing to take any action to address her complaints, (c) offering her a separation agreement instead of finding her a position when she was able to return to work following her medical leave of absence, (d) when she rejected the separation agreement, demanding she be submit to a fitness for duty examination after labeling her an "angry black woman who allegedly threatened violence against a Defendant JPM employee, (e)  terminating her employment after interfering with her ability to find a position when she was able to return to work, and (f) failing to advise Plaintiff Wilson of her actual terminating date resulting in her being charged with fraud by the New York Department of Labor.

148.    Defendants violated the NYCHRL as a result of the retaliatory actions taken against Plaintiff Wilson in response to her protected acts of complaining and/or objecting to discrimination and a hostile working environment.

149.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial losses.

150.    As a direct and proximate result of Defendants' actions, Plaintiff Wilson has suffered and continues to experience pain, suffering, personal physical injury, and emotional distress.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.  An award of compensatory and punitive damages;

b.  An aware of costs of action incurred herein, including expert fees;

c.  An award of attorneys' fees, including fees pursuant to NYCHRL and other applicable statutes;

d.  An award of pre-judgment and post-judgment interest as provided by law; and

e.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

f.  applicable statutes;

g.  An award of pre-judgment and post-judgment interest as provided by law; and

h.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## SEVENTH COUNT
### (NYSHRL – Defendant Dimon - Individual Liability)

151.  Plaintiff Wilson repeats the allegations as if set forth herein.

152.  Defendant Dimon is the Chairman of Defendant JPM Board, and Chief Executive Officer and President of Defendant JPM.

153.  During all times relevant to this Complaint, Defendant Dimon, who has an ownership interest in Defendant JPM, had the authority to hire and fire Defendant JPM employees.

154.  Plaintiff Wilson dutifully complied with Defendant Dimon's representation that he would address any complaint brought to his attention by an employee who failed to have his/her issues satisfactorily resolved.

155.    Plaintiff Wilson brought her complaints of hostile work environment, discrimination and retaliation to the attention of Defendant Dimon on at least seven (7) separate occasions.

156.    Defendant Dimon aided and abetted the hostility, discrimination, and retaliation to which Plaintiff Wilson was subjected when he failed to take any action to address Plaintiff Wilson's complaints thereby allowing the hostility, discrimination and retaliation to continue unabated.

157.    As result of this conduct, Defendant Dimon is liable as an individual under the NYSHRL.

158.    As a result of Defendant Dimon's actions, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial damages.

159.    As a further result of Defendant Dimon's actions, Plaintiff Wilson has suffered and continues to suffer emotional pain, suffering, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

a.   An award of compensatory and punitive damages;

b.   An aware of costs of action incurred herein, including expert fees;

c.   An award of attorneys' fees, including fees pursuant to NYSHRL and other applicable statutes;

d.   An award of pre-judgment and post-judgment interest as provided by law; and

e.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

### EIGHTH COUNT
### (NYCHRL – Defendant Dimon - Individual Liability)

160.    Plaintiff Wilson repeats the allegations as if set forth herein.

161.    Defendant Dimon is the Chairman of Defendant JPM Board, and Chief Executive Officer and President of Defendant JPM.

162.    At all times relevant to this Complaint, Defendant Dimon, who has an ownership interest in Defendant JPM, had the authority to hire and fire Defendant JPM employees.

163.    Plaintiff Wilson dutifully complied with Defendant Dimon's representation that he would address any complaint brought to his attention by an employee who failed to have his/her issues satisfactorily resolved.

164.    Plaintiff Wilson brought her complaints of hostile work environment, discrimination and retaliation to the attention of Defendant Dimon on at least seven (7) separate occasions.

165.    Defendant Dimon aided and abetted the hostility, discrimination, and retaliation to which Plaintiff Wilson was subjected when he failed to take any action to address Plaintiff Wilson's complaints thereby allowing the hostility, discrimination and retaliation to continue unabated.

166.    As result of this conduct, Defendant Dimon is liable as an individual under the NYCHRL.

167.    As a result of Defendant Dimon's actions, Plaintiff Wilson has suffered and continues to suffer loss of income, loss of benefits, and other financial damages.

168.    As a further result of Defendant Dimon's actions, Plaintiff Wilson has suffered and continues to suffer emotional pain, suffering, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff Wilson prays for relief as follows:

    a.    An award of compensatory and punitive damages;

    b.    An aware of costs of action incurred herein, including expert fees;

29

c.   An award of attorneys' fees, including fees pursuant to NYCHRL and other

applicable statutes;

d.   An award of pre-judgment and post-judgment interest as provided by law; and

e.   Such other and further legal and equitable relief as this Court deems necessary,

just and proper.

### JURY TRIAL DEMANDED

Plaintiff Wilson demands a jury trial of all issues so triable in this case.

Respectfully submitted,
**NIEDWESKE BARBER HAGER, LLC**

Dated:   September 25, 2019           By:  /s/ Linda J. Niedweske _____

Linda J. Niedweske, Esq.
98  Washington Street
Morristown, New Jersey 07960
www.*N-B*Law.com
lniedweske@*N-B*Law.com
Counsel for Plaintiff Wanda Wilson

**DOCUMENT ELECTRONICALLY FILED**