UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WANDA WILSON,

                              Plaintiff,                    20-cv-4558 (JMF)

            - against -

JPMORGAN CHASE, JAMIE DIMON, Individually          Oral Argument Requested
and in his Official Capacity, and various "John Does,"

                              Defendants.


## **MEMORANDUM OF LAW IN OPPOSITION**

Elizabeth Eilender, of counsel
eeilender@lawjaros.com
David Tolchin
dtolchin@lawjaros.com
JAROSLAWICZ & JAROS PLLC
*Attorneys for Plaintiff*
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

Benjamin Brafman, Esq.
BRAFMAN & ASSOCIATES, P.C.
*Trial Counsel to Plaintiff*
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800
BBrafman@braflaw.com

## **Table of Contents**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

POINT I

    DEFENDANTS' RULE 12(B)(6) MOTION MUST BE DENIED AS
    PLAINTIFF HAS ASSERTED SUFFICIENT FACTS TO SUPPORT HER
    CLAIM ................................................................................................................2

        A.    Plaintiff States Claims Upon Which Relief can be Granted ....................................2

        B.    Plaintiff Has Pled Sufficient Facts to Sustain Her Claim of Hostile
            Work Environment Under the NYSHRL and the NYCHRL ..................................4

        C.    Plaintiff Has Pled Sufficient Facts to Sustain Her Claim for Race
            Discrimination Pursuant to the NYSHRL and the NYCHR ..................................15

        D.    Plaintiff Has Pled Sufficient Facts to Sustain Her Claim for
            Retaliation Pursuant to the NYSHRL and the NYCHRL ......................................17

POINT II

    DIMON, AN OWNER OF JMP WHO COULD HIRE AND FIRE AND WHO
    AIDED AND ABETTED UNLAWFUL CONDUCT, CAN BE FOUND
    LIABLE UNDER BOTH THE NYSHRL AND THE NYCHRL ...........................................21

POINT III

    DISCOVERY SHOULD NOT BE STAYED ........................................................................25

CONCLUSION ...................................................................................................................... 25

**Table of Authorities**

**Cases**

*Abreu v. City of N.Y.,* 657 F. Supp. 2d 357 (EDNY 2009) ............................................ 3

*Adams v. Delta Airlines, Inc.*, 2017 U.S. Dist. LEXIS 208639 (EDNY Dec. 18, 2017) .............. 21

*Anderson News LLC v. American Media Inc.,* 680 F. 3d 162 (2d Cir. 2012) ................................ 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 3

*Askin v. Department of Educ. of the City of N.Y.*, 110 A.D.3d 621 (1st Dep't 2013) .................. 16

*Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 289 (S.D.N.Y, 2009) .................................... 18

*Bagley v. Baruch College*, 2012 N.Y. Misc. LEXIS 6384 (NY County 2012) ......................... 15

*Bailey v. Brooklyn Hosp. Ctr.*, 2017 N.Y. Misc. LEXIS 24 (NY County 2017) ....................... 18

*Bangkok Crats Corp. v. Capitolo di San Piertro in Vaticano*, 2005 U.S. Dist.
    LEXIS 14700 (SDNY 2005) ..................................................................................... 3

*Barella v. Vill. of Freeport,* 16 F. Supp. 3d 144 (EDNY 2014) ........................................... 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 3

*Brook v. Overseas Media, Inc.*, 69 A.D.3d 444 (1st Dep't 2010) ......................................... 18

*Canty v. Department of Educ. of the City of N.Y.* 2018 N.Y. Misc. LEXIS 346
    (Kings County 2018) ............................................................................................... 16

*Chen v. Shanghai Café Deluxe, Inc.*, 2019 U.S. Dist. LEXIS 46330 (SDNY Mar.
    8, 2019) ................................................................................................................. 23

*Chin v. New York City Hous. Auth.*, 106 A.D.3d 443 (1st Dep't 2013) ................................... 4

*Cruz v. Coach Stores, Inc.,* 202 F.3d 560 (2d Cir. 2000) .................................................... 5

*Delisi v. National Ass'n of Prof'l Women, Inc.,* 48 F. Supp. 3d 492 (EDNY 2014) .................. 23

*EEOC v. Suffolk Laundry Servs., Inc.,* 48 F. Supp. 3d 497 (EDNY 2014) ............................. 22

*Figueroa v. Rsquared NY, Inc.,* 89 F. Supp. 3d 484 (EDNY 2015) ....................................... 21

*Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295 (2004) ............................................... 15

*Gelboim v. Bank of Am. Corp.,* 823 F. 3d 759 (2d Cir. 2016) .............................................. 4

*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2001) .................................... 18

*Grimes-Jenkins v. Consol. Edison Co. of N.Y.*, 2017 U.S. Dist. LEXIS 77710
    (SDNY 2017) ......................................................................................................... 16

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)...........................................................5

*Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005) .................................................3

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*,
    701 F. Supp. 2d 356, 378 (EDNY 2010)...............................................................3

*James v. New York Racing Ass'n*, 223 F.3d 149 (2d Cir. 2000)................................15

*Kaplan v. New York City Dep't of Health & Mental Hygiene*, 142 A.D.3d 1050
    (2d Dep't 2016) ...........................................................................................14, 18

*Kellman v. Metro Transp. Auth.*, 8 F. Supp. 3d 351 (SDNY 2014)............................22

*Kravitz v. Binda*, 2020 U.S. Dist. LEXIS 10893 (SDNY 2020)................................. 3

*Lewis v. Triborough Br. & Tun. Auth.*, 77 F. Supp. 2d 376 (SDNY 1999) ................22

*Lowery v. WMC-TV*, 658 F. Supp. 1240 (W.D. Tenn. 1987) .....................................17

*Magnotti v. Crossroads Healthcare Mgt., LLC*, 126 F. Supp.3d 301 (EDNY 2015)...................22

*Marchuk v. Farugi & Farugi, LLP*, 100 F. Supp. 3d 302 (SDNY 2015) ...................21

*McCall v. Pataki*, 232 F.3d 321 (2d Cir. 2000) .........................................................3

*Nokaj v. North E. Dental Mgt., LLC*, 2019 U.S. Dist. LEXIS 24396 (SDNY Feb.
    14, 2019)..........................................................................................................23

*O'Halloran v. Metro Transp. Auth.*, 154 A.D.3d 83 (1st Dep't 2017)........................15

*Palin v. New York Times Co.*, 904 F.3d 804 (2d Cir. 2019) .......................................4

*Papasan v. Allain*, 478 U.S. 265 (1986) .....................................................................3

*Parra v. City of White Plains*, 48 F. Supp. 3d 542 (SDNY 2014)..............................22

*Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007) ......................................................5, 13

*Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344 (NDNY 2010)...................22

*Pits, Ltd. v. American Express Bank Int'l*, 911 F. Supp. 710 (SDNY 1996)................2

*Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352 (EDNY 2012)....................21

*Smith v. Town of Hempstead Dep't of Sanitation Sanity Dist. No. 2*, 798 F. Supp.
    2d 443 (EDNY 2011) .....................................................................................22

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) ..........................................................5

*Thomas v. Mintz*, 2018 N.Y. Misc. LEXIS 3282 (NY County 2018)..........................18

*Williams v. Deutsche Bank Group*, 2013 N.Y. Misc. LEXIS 7160 (NY County 2013).................4

**Statutes and Rules**

Federal Rules of Civil Procedure 12(b)(6)............................................................... *passim*

Federal Rules of Civil Procedure 12(c) .....................................................................1, 25

NY Exec. Law § 296...................................................................................................4, 15

NY Exec. Law § 296(1)..................................................................................................21

NY Exec. Law § 296(1)(a)..............................................................................................15

NY Exec. Law § 296(6)..................................................................................................22

NY Exec. Law § 300.......................................................................................................15

NYC Admin. Code § 8-107 ............................................................................................15

NYC Admin. Code § 8-107(1)(a) ...................................................................................15

NYC Admin. Code § 8-107(6).........................................................................................22

NYC Admin. Code § 8-130 ............................................................................................15

The Local Civil Rights Restoration Act, Local Law 85 of 2005 ...................................18

**Other Authorities**

*Seeing Subtle Racism*, 6 STAN. J.C.R. & CL 183 (Oct. 2010) .....................................14

## PRELIMINARY STATEMENT

This diversity action, commenced in New Jersey State Court and removed to New Jersey District Court, has been transferred to this Court on the motion of the defendants. They now move this Court to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and to stay discovery under Rule 12(c).

Their motion should be denied as plaintiff has sufficiently pled facts upon which relief can be granted for her claims pursuant to the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"), much of which was articulated in great detail in her communications to the defendant billionaire and large stakeholder in the defendant JPMorgan Chase ("JPM"), defendant Jaime Dimon ("Dimon").

Dimon held himself out to his employees as an approachable, problem-solving employer, who encouraged his employees to "come to me" with any issues they have. Plaintiff, Wanda Wilson, attempted to do just that. She sent several emails to Dimon calling his attention to discrimination against her, and pleaded with him to step in and do something about it.

Plaintiff articulated that her workplace became hostile when she was subjected to, for example, being placed in a subservient role and treated in a more disparaging manner than her non-African American colleagues. She further stated that she had been the victim of race discrimination by not having the same opportunities as her less experienced non-African American colleagues, being referenced as an "angry black woman" resulting in JPM not timely returning her to work following her medical leave of absence and subjecting her to an unnecessary fitness for duty examination, and not receiving the same treatment as her non-African American colleagues in response to her filing complaints of hostile work environment. Most notably, Plaintiff recounted the retaliation she faced when she complained about the racially hostile work environment she endured, which unleashed a year-long battle of emotional and physical distress due to the treatment she received by Defendants and their representatives.

Plaintiff was not subjected to mere "petty slights" or "trivial inconveniences" as Defendants suggest, but rather to a systematic, yet subtle, race discrimination which terminated Plaintiff's twenty (20)-year career with JPM. While Plaintiff was not subjected to an overt display of racism, she was the victim of more insidious "modern racism," increasingly common in the workplace of today.

Contrary to Defendants' assertion, Dimon can be held individually liable for the unlawful conduct to which Plaintiff was subjected. Dimon has an ownership interest in JPM, can hire and fire, and, by his inaction following Plaintiff's having contacted him nine (9) times with no response, he condoned the unlawful conduct.

## STATEMENT OF FACTS

Plaintiff will rely upon her First Amended Complaint ("FAC"), filed September 25, 2019. It alleges Racially Hostile Work Environment under NYSHRL (Count 1) and NYCHRL (Count 2); Race Discrimination under NYSHRL (Count 3) and NYCHRL (Count 4); Retaliation under NYSHRL (Count 5) and NYCHRL (Count 6); and Individual Liability against Dimon under NYSHRL (Count 7) and NYCHRL (Count 8). (See Declaration of David Tolchin, **Exhibit A**).

## POINT I

## DEFENDANTS' RULE 12(B)(6) MOTION MUST BE DENIED AS PLAINTIFF HAS ASSERTED SUFFICIENT FACTS TO SUPPORT HER CLAIMS

### A. Plaintiff States Claims Upon Which Relief Can Be Granted

"Rule 12(b)(6) imposes a substantial burden on the moving party. A court may not dismiss a complaint unless the movant demonstrates beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Pits, Ltd. v. American Express Bank Int'l,* 911 F. Supp. 710, 714 (SDNY 1996) (citations omitted). For a complaint to survive dismissal

pursuant to Rule 12(b)(6), it must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

"In deciding a motion to dismiss pursuant to [Rule] 12(b)(6), a court must take factual allegations in the complaint to be true and draw all reasonable inferences in the plaintiff's favor," *Kravitz v. Binda,* 2020 U.S. Dist. LEXIS 10893 at *10 (SDNY 2020). "If the pleadings contain sufficient factual matter, accepted as true, to show that the plaintiff may be entitled to relief, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Abreu v. City of N.Y.*, 657 F. Supp. 2d 357 (EDNY 2009) (*citing McCall v. Pataki*, 232 F.3d, 321, 323 (2d Cir. 2000)). "A complaint attacked by a . . . motion to dismiss does not need detailed factual allegations to withstand a Rule 12(b)(6) motion to dismiss, a pleader must provide the grounds of his entitlement to relief which requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "The pleader must set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.,* 701 F. Supp. 2d 356, 378 (EDNY 2010). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the Complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The defendant bears the burden of showing that no claim has been presented." *Bangkok Crats Corp. v. Capitolo di San Piertro in Vaticano*, 2005 U.S. Dist. LEXIS 14700 (SDNY 2005) (quoting *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005)).

Even if defendants' characterization of what transpired were more plausible than the allegations in Plaintiff's Complaint, it would still be error to adopt defendants' self-serving spin. The Second Circuit recently cautioned that "it is not the district court's province to dismiss a

plausible complaint because it is not as plausible as the defendant's theory." *Palin v. New York Times Co.,* 904 F.3d 804, 815 (2d Cir. 2019). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Gelboim v. Bank of Am. Corp.,* 823 F. 3d 759, 781 (2d Cir. 2016) (quoting *Anderson News LLC v. America Media Inc.,* 680 F.3d 162, 184-85 (2d Cir. 2012)).

## B.     Plaintiff Has Pled Sufficient Facts to Sustain Her Claim of Hostile Work Environment Under the NYSHRL and the NYCHRL

Under both the NYCHRL and NYSHRL[1], a plaintiff need not show that the harassment was severe or pervasive, but she must show that she was subjected to conduct that amounted to more than petty slights and trivial inconveniences because of her membership in a protected category." *Williams v. Deutsche Bank Gr.*, 2013 N.Y. Misc. LEXIS 7160 at *16 (NY County 2013). "The primary focus under the NYCHRL is on whether the alleged harassment constitutes inferior terms and conditions based on race. Under either state or city law, the plaintiff must demonstrate that the abusive conduct was motivated by animus toward a protected class." *Id.* (internal citations omitted). The plaintiff must show that discrimination was one of the motivating factors for the defendant's conduct. *Chin v. New York City Hous. Auth.*, 106 A.D.3d 443 (1st Dep't 2013).

Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an

---

[1] Effective October 11, 2019, the New York Legislature amended and broadened the protections under the NYSHRL to replace the term "severe or pervasive" with the term "petty slights and trivial inconveniences," tracking the language of the NYCHRL. This amendment further provides that whether a victim of a hostile work environment complained to the employer shall not be determinative of whether the employer is, in fact, liable. Moreover, nothing in this section requires that an employee demonstrate the existence of an individual to whom the employee's treatment must be compared. NY EXEC. LAW § 296.

employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

"Ultimately, to avoid dismissal under [Rule] 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of employment altered for the worse and we have repeatedly cautioned against setting the bar too high in this context." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) (where the court held that discriminatory behavior not directed at plaintiff can contribute to the creation of an overall hostile work environment).

During Plaintiff's last year of active employment and continuing until her termination from JPM, she was subjected to an increasingly threatening, humiliating and offensive workplace resulting in a hostile working environment as a result of her race that interfered with her work and her work performance. To wit:

In or about March 2016, Plaintiff was assigned as the Executive Administrative Assistant for Paul Jensen ("Jensen"), Managing Director, Chief Administrative Officer and Head of Audit (FAC ¶ 27). At this same time, Janet Jarnigan ("Jarnigan"), Executive Director, Audit Manager, was also assigned to Jensen as Team Leader (FAC ¶ 28). As the months progressed, Plaintiff was no longer an integral member working with Jensen and Jarnigan and was relegated to a more subservient role (FAC ¶¶ 30-31). Over the next several months, the respectful tone with which Jarnigan addressed Plaintiff had slowly deteriorated so that by December 2016 Jarnigan was ordering Plaintiff to bring Jarnigan's lunch, offering Plaintiff's administrative services to JPM consultants and third parties without first checking Plaintiff's availability or if it was appropriate even to offer her services (FAC ¶ 32). Jarnigan's treatment of Plaintiff was dramatically different than her treatment of the non-African American Executive Administrative Assistants with whom

- 5 -

Jarnigan worked (FAC ¶ 33). As the months passed, Jarnigan became more deliberate and overt in her demeaning treatment of Plaintiff (FAC ¶ 35).

Plaintiff complained to Jensen that Jarnigan was exceeding her authority, spreading false rumors about Plaintiff to other secretaries, and, in general, creating a hostile working environment (FAC ¶ 36). Jensen accused Plaintiff of being "a bit dramatic" and refused to intervene (FAC ¶ 37).

Plaintiff then filed a complaint with Samantha Garber ("Garber"), Executive Director & Head of Audit, Human Resources (FAC ¶ 38). Plaintiff also noticed her colleagues distancing themselves from her, exacerbating the hostile work environment and causing her to feel increasingly isolated (FAC ¶ 41). Plaintiff's colleagues did mention, however, that Jarnigan had been spreading false rumors about Plaintiff, including that Plaintiff had made one of the African American officers cry and that Plaintiff allegedly had become such a problem that Garber had reprimanded her in December 2016 (FAC ¶ 42).

After months of being demeaned, bullied, disrespected and relegated to a waitress, Jarnigan's campaign of mockery and attempts to discredit Plaintiff's stellar reputation were more than Plaintiff could endure and she left her office frantic and embarrassed (FAC ¶ 44). For the first time in her decades-long career with JPM, Plaintiff found herself treated with the same derision she had seen directed at other JPM African-American employees, who were forced to choose either to endure the treatment and maintain their employment or to speak out and face retaliation (FAC ¶ 45).

On or about April 5, 2017, Plaintiff took a sick day and called Garber to again report the hostile work environment that Jarnigan was perpetuating by spreading false rumors and sabotaging Plaintiff's reputation (FAC ¶ 46). She further complained that Jarnigan was bullying her, belittling her work ethic and causing other employees to treat her differently (FAC ¶ 47). Plaintiff contacted JPM's Employee Assistance Program ("EAP") for assistance, which referred her to a therapist to

help cope with the hostility (FAC ¶ 48). Garber then escalated Plaintiff's complaint to Barrack Green ("Green"), Vice-President of Employee Relations, who escalated Plaintiff's complaint to Charity Blackburn ("Blackburn"), Vice-President, Employee Relations (FAC ¶¶ 49, 52).

Plaintiff also contacted Dimon referencing "Hostile Work Environment-Audit" seeking his assistance to remediate the hostile working environment (FAC ¶ 54). She further complained to Dimon of Jarnigan's texting Jensen while he was on vacation to report Plaintiff for using his office phone, which she had always been permitted to do; the negative rumors and innuendoes that Jarnigan was spreading about Plaintiff; and how Plaintiff was being ostracized by her colleagues as a result (FAC ¶ 57). Plaintiff even complained about how she had contacted Garber to report the negative rumors, the sabotaging of her relationships and how Jarnigan was using Jensen's vacation as an opportunity to further harass Plaintiff and treat her as a waitress/servant (FAC ¶ 58). Plaintiff concluded her letter by stating: "In conclusion, I have two options available to me and they do not help my sanity. My first option is to take "short term disability" and my second option is to return to work and continue to be tortured, degraded and humiliated" (FAC ¶ 59).

On or about April 17, 2017, Plaintiff returned to work and spent most of the day in the bathroom crying, praying and throwing up following her review of an email sent on that date from Cherie Niswonger ("Niswonger"), Vice-President of Employee Relations, to Jensen where Niswonger advised him that Plaintiff had complained to Dimon that Jensen docked her pay, and without Plaintiff's authorization, told Jensen that she suffered from anxiety (FAC ¶ 60). Plaintiff was in a panic that Jensen's already demeaning attitude toward her would now become outright hostility since learning that Plaintiff complained to Dimon of the docked pay (FAC ¶ 61). On or about April 18, 2017, Plaintiff returned to work but left early due to concerns that Jensen would retaliate against her and her overall concern that Employee Relations, instead of assisting her with the hostile environment, was exacerbating it (FAC ¶ 62).

On or about April 19, 2017, Plaintiff was admitted to the hospital with chest pains, high blood pressure, and breathing issues (FAC ¶ 63). On or about April 20, 2017, Plaintiff was transferred to the hospital's psychiatric unit on suicide alert (FAC ¶ 64). On or about April 24, 2017, Jensen denied Plaintiff's request for additional sick days requiring that she request emergency vacation from Garber (FAC ¶ 65).

On April 24, 2017, Plaintiff wrote a second letter to Dimon requesting his assistance and guidance having learned that he had again promised in the secretarial town hall that if a JPM employee sees something they should say something and he would provide support and follow the emails until the matter is resolved (FAC ¶ 66). On or about June 5, 2017, Plaintiff's disability leave of absence was reinstated following her therapist advising Dr. Daniel Conti ("Conti"), JPM's Global Employee Assistance & Worklife Program Manager, that she should not be returned to the same situation without risking a relapse (FAC ¶ 68).

A month later, Plaintiff was ready to return to work as of July 7, 2017 (FAC ¶ 69). Clarissa Ramos-Cafarelli ("Ramos-Cafarelli"), Managing Director of Employee Relations, was assigned as Plaintiff's contact and represented that a team of recruiters would be working with her to find a new position within JPM (FAC ¶ 70). Plaintiff shared with Ramos-Cafarelli all of her phone texts, emails, employment history and names of employees who had witnessed Jarnigan's hostile treatment of her in order to assist with the investigation into Plaintiff's complaints, which, upon information and belief, had not been previously initiated (FAC ¶ 72). Plaintiff wrote her third latter to Dimon, copying Ramos-Cafarelli, referencing "Conspiracy Theory," and stating, in pertinent part:

> It is truly a disgrace to see that after 20 years of service that JPMorgan was allowed to violate, bully, belittle and humiliate me and think it is ok. Abraham Lincoln freed the slaves. My 20 years of service anniversary date has passed. If I was white you would have contacted me or at least emailed my employee recognition gifts to my home.        (FAC ¶ 72).

> JPMorgan classified my depression, anxiety attacks, high blood pressure, suicide watch as "Employee Own Illness" on your short-term disability forms – really ok! January my performance review was Meets + and I came to work and had an anxiety attack for no reason?     (FAC ¶ 73).

By July 12, 2017, Plaintiff was scheduled to return to work but still had no specific assignment (FAC ¶ 74). By July 24, 2017, Plaintiff had yet to hear from anyone from the team of recruiters referenced by Ramos-Cafarelli (FAC ¶ 75). On or about August 10, 2017, Plaintiff sent a fourth letter to Dimon referencing "Racism at its best," which was a follow-up to a telephone conversation she had on that day with Conti and a member of JPM's security (FAC ¶ 76). Plaintiff complained, stating:

> Please stop harassing me. Please stop judging me by the color of my skin and start respecting me as a person, a black woman who spoke up regardless of the consequences. As I have said on numerous occasions, I understand that everyone involved in this racist situation works for JPMorgan and I am the underdog. I get it, you are not trying to help me. If you were trying to help me or keep me employed, I would not be sitting at home. Clarissa told me approximately one month ago that a recruitment team would be in touch to help me find a new position within JPMorgan, to date, I have not had one interview via phone or in person. I have worked with JPMorgan for 20+ years with Meets plus performance reviews and JPMorgan can't find a new position? WOW that is surprising. It is clear that JPMorgan does not have good intentions in this "Discriminatory Situation."                                 (FAC ¶ 77).

Plaintiff further complained about JPM's security stunt where she was portrayed as an "angry black woman" who was a threat to herself and others, clarifying that she was incapable of harming anyone, even herself, despite her prior suicidal ideations (FAC ¶ 78). Plaintiff concluded her letter by stating:

> Meeting with Clarissa of Employee Relations and speaking with Dr. Dan Conti (JPMorgan's doctor), pleading for clarity and guidance the only answer you can give is a call from security? Audit of JPMorgan is a racist

> department and what has happened to me is despicable. You speak of
> diversity and the Officers you have running your firm are on a different
> page and time zone. Modern day racism is in full effect at JPMorgan.

> The bottom line to this situation is disappointment and I am appalled. For
> four months, at the hands of JPMorgan, I have suffered mentally,
> emotionally and physically. I have been violated medically, emotionally
> destroyed, humiliated as a human being and my life is ruined. (FAC ¶ 79).

In response to Plaintiff's plea for help, on or about August 23, 2017, she received a
severance agreement, which she viewed as a slap in her face after twenty years with JPM, during
which time she rarely took lunch, had an outstanding record, and was never reprimanded (FAC ¶
80). JPM was waiting for Plaintiff to resign as no one from the "team of recruiters" referenced by
Ramos-Cafarelli had contacted her during the prior two (2) months to assist with finding her a
position at JPM (FAC ¶ 81).

By September 12, 2017, Plaintiff was getting paid as an employee but without a position,
having not been contacted by any JPM Human Resources representative during the prior sixty (60)
days for an interview via phone or in person (FAC ¶ 82). In a letter, dated October 11, 2017,
Plaintiff wrote a fifth letter to Dimon referencing "Whistleblower-Racism-Separation Agreement,"
where she recounted the prior seven (7) months when she was hospitalized on April 12th, her
disability extension was declined by JPM on June 5th, her disability was reinstated on June 9th, but
only after Conti spoke with her therapist, she returned to JPM without a job on July 12th, remained
without a job on August 12th, was handed a separation agreement on August 23rd, and by October
11, 2017, she was advised that unless she found a position by November 1, 2017 or agreed to sign
the separation agreement, her employment would be terminated (FAC ¶ 84). Plaintiff wrote a sixth
letter to Dimon, also dated October 11, 2017, where she referenced "Three Strikes Against Me"
referencing her African American, her gender, and her lack of a college degree (FAC ¶ 86).

In an email, dated November 3, 2017, Plaintiff was told for the first time that she needed to present for a *fitness for duty evaluation* (FAC ¶ 87). In a letter, dated November 8, 2017, Plaintiff wrote Dimon for the seventh time with the subject heading "Violation of Medical Rights/Separation Agreement to Close EEOC Complaint." (FAC ¶ 88). Plaintiff referenced a voice message she received from the doctor who was to evaluate her fitness, who indicated that he had no idea why JPM was calling him to evaluate her (FAC ¶ 89). Plaintiff concluded her letter with "More humiliation and harassment!" (FAC ¶ 89).

In an email, dated November 9, 2017, JPM's legal counsel advised Plaintiff that she was required to submit to the fitness for duty examination because of statements she allegedly made about harming herself and another JPM employee, as well as concerns from her medical provider about the effects on her well-being on her returning to work (FAC ¶ 90). In actuality, any threats Plaintiff made to her own well-being were resolved months before and she never threatened a JPM employee (FAC ¶ 91). As for her medical provider's concerns about Plaintiff returning to work, these involved JPM's failure to remediate the hostile working environment and its refusal to find her a suitable position during the months after her clearance to return to work following her disability leave of absence (FAC ¶ 92). There was no need to subject Plaintiff to a fitness for duty examination other than to further harass her, all of which was borne out by JPM's medical provider, who on or about December 8, 2017, found her fit for duty and not a threat to any JPM employee or herself (FAC ¶ 93). In a letter, dated December 29, 2017, Plaintiff contacted Dimon for the eighth time complaining of the humiliating situation she faced referencing emotional and mental abuse (FAC ¶ 97).

In or about February 2018, Plaintiff advised JPM that Plaintiff had no intention of resigning her employment, was not going to sign the separation agreement, was not going to accept disability leave, but that she did want to return to work in a position which was comparable to the salary, responsibilities and location where she had most recently worked (FAC ¶ 98).

In her ninth letter to Dimon, this one dated February 3, 2018, referencing "JPMorgan's Retaliation has turned to insults," Plaintiff complained that Tara Griffin ("Griffin"), JPM's legal counsel, spoke of her derisively when Plaintiff indicated her desire to return to work rather than take a separation package (FAC ¶ 99). Plaintiff repeated many of the themes she had written to Dimon over the prior year, such as the disparate treatment of Black employees as compared to their non-Black colleagues, the humiliation she suffered which was never remediated by JPM's H.R. representatives, and, again, to request his assistance to return as a valuable member of JPM's community rather than face termination as had been repeatedly threatened over the prior year (FAC ¶ 100).

On or about March 9, 2018, Plaintiff was offered a non-competitive position, which was several levels below her prior grade and reporting to an individual with whom she had difficulties in the past (FAC ¶ 101). Plaintiff did not want to accept a demotion nor did she want to return to a potentially hostile work environment, an explanation which was rejected by JPM, despite knowing that Plaintiff's medical leave of absence was due to a hostile working environment (FAC ¶ 102). Plaintiff was then sent on a series of interviews for positions selected by JPM which were clearly beneath her experience and expertise (FAC ¶ 103). In fact, those interviewing her expressed dismay that she was even sent on those interviews, causing Plaintiff to question JPM's good faith commitment to having her return to work (FAC ¶ 104).

The next series of interviews were for positions selected by Plaintiff (FAC ¶ 105). While she received positive feedback from many of those interviewing her and was even advised that she would be perfect for one of the positions, she was never chosen due to JPM's claim that she somehow "lacked enthusiasm" (FAC ¶ 106). When Plaintiff questioned JPM's obviously pretextual "lack of enthusiasm" feedback, JPM claimed that Plaintiff did not ask enough questions or show sufficient interest in the positions, assertions which Plaintiff strongly denied (FAC ¶ 107).

Garber wrote Plaintiff a letter, dated May 24, 2018, advising that Plaintiff's employment would terminate, effective May 29, 2018, if she was unable to find a position within JPM or if she was not retained in an unpaid status (FAC ¶ 108). Effective May 29, 2018, based upon Garber's letter, having received no information from JPM to the contrary, Plaintiff believed her employment had terminated and applied for unemployment compensation with the New York Department of Labor ("NYDOL") (FAC ¶¶ 109-110). JPM shockingly then had the gall to dispute plaintiff's date of termination with the NYDOL by informing them that Plaintiff's date of termination was actually 2 weeks later on June 14, 2018. Not surprising, the NYDOL then accused Plaintiff of fraud adding even more insult to injury directly caused by JPM's conflicting and confusing conduct (FAC ¶¶ 111-115).

Taking into account the totality of the circumstances faced by Plaintiff beginning in or around December 2016 and ending on or about June 14, 2018, it is clear that the conduct faced by Plaintiff was ongoing, severe, threatening and humiliating, which, ultimately interfered with her work performance and her ability to return to active work at JPM. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

Defendants argue that Plaintiff's claim for hostile work environment should be dismissed as she has merely set out "petty slights and trivial inconveniences." Defendants cite to cherry-picked excerpts contained in Plaintiff's Amended Complaint to support their claims of "petty slights and trivial inconveniences." However, in a case directly on point, the Appellate Division, Second Department held:

> The [lower] court erred in determining that the subject cause of action must be dismissed because the plaintiff failed to show that the behavior of her supervisor constituted more than a petty slight or trivial inconvenience. The plaintiff does not have this burden. Rather, a contention that the behavior was a petty slight or trivial inconvenience constitutes an affirmative defense . . . , which should be raised in the defendant's answer, and does not lend itself to a pre-answer motion to

> dismiss . . . . A motion to dismiss merely addresses the adequacy of the
> pleading, and does not reach the substantive merits of a party's cause of
> action. "Therefore, whether the pleading will later survive a motion for
> summary judgment, or whether the party will ultimately prevail on the
> claims, is not relevant on a pre-discovery motion to dismiss." (*Lieberman
> v. Green*, 139 A.D.3d 815, 816 (2016)).

*Kaplan v. New York City Dep't of Health & Mental Hygiene*, 142 A.D.3d 1050, 1051 (2d Dep't

2016) (Emphasis added) (citations omitted).

Defendants' claim that Plaintiff asserted mere "petty slights and trivial inconveniences" is

without merit as exemplified by the litany of issues she faced during her final 18 months as a JPM

employee. As set forth in the Complaint, Plaintiff is no "shrinking violet" or an individual who

claims racial discrimination in every corner of her life. Plaintiff endured her sister being brutally

murdered in 2003 by her ex-husband (FAC ¶ 15), yet it was JPM's demeaning, dismissive and

subservient treatment of Plaintiff from 2016-2017 which caused Plaintiff to be hospitalized and

placed on suicide watch (FAC ¶¶ 63, 64). Deeming Plaintiff's complaints to be mere petty slights

or trivial inconveniences discounts treatment that an African American woman of her age and

background would find so hostile and humiliating so as to result in hospitalization.

At this phase of the litigation, Plaintiff need not prove her claims of hostile work

environment, but, as she has done, merely set forth sufficient facts to support her claims and not

to merely recite the elements comprising a hostile work environment due to race. Plaintiff has met

this standard and, therefore, the motion to dismiss her claim for hostile work environment due to

race must be denied.[2]

---

[2] The absence of overt racist actions or statements directed toward Plaintiff, even if true, is not dispositive. *See Seeing Subtle Racism,* 6 STAN. J.C.R. & CL 183 (Oct. 2010), attached as Tolchin Decl., **Exhibit B**) (positing that courts are moving away from traditionally defined racism to acknowledge spectrums of conscious and subconscious, overt and covert, obvious and subtle actions that constitute racial harassment. A growing body of social science research has substantiated the term "modern racism" to reflect frequently subtle forms of racism in contemporary America.).

**C. Plaintiff Has Pled Sufficient Facts to Sustain Her Claim for Race**
**Discrimination Pursuant to the NYSHRL and the NYCHR**

"Under both the NYSHRL and NYCHRL, it is an unlawful discriminatory practice for an employer to refuse to hire or employ or to fire or to discriminate against an individual in the terms, conditions or privileges of employment because of, as pertinent here, the individual's…race…." NY EXEC. LAW § 296(1)(a); NYC Admin. Code § 8-107(1)(a).

For a cause of action invoking protections under both the State and City Human Rights Laws, a plaintiff must assert that she is a member of a protected class, that she was qualified for her position, that she suffered an adverse employment action, and that the adverse action was due to circumstances that could be deemed discriminatory. NY EXEC. LAW § 296; NYC Admin. Code § 8-107; *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (2004); *O'Halloran v. Metro Transp. Auth.*, 154 A.D.3d 83 (1st Dep't 2017).

"A plaintiff's initial burden of establishing a *prima facie* case of discrimination 'is not a significant hurdle." *Bagley v. Baruch College*, 2012 N.Y. Misc. LEXIS 6384 at *11 (NY County 2012); *See Forrest*, 3 N.Y.3d at 326 (plaintiff does not need to prove discrimination by direct evidence; circumstantial evidence is sufficient); *James v. New York Racing Ass'n*, 223 F.3d 149, 153-54 (2d Cir. 2000) (minimal showing for *prima facie* case requires no evidence of discrimination; preference for person not in a protected category is enough). "Moreover, both the NYSHRL and NYCHRL require that their provisions be "construed liberally" to accomplish the remedial purposes of prohibiting discrimination." NY EXEC. LAW § 300; NYC Admin. Code § 8-130; and *Bagley*, 2012 N.Y. Misc. LEXIS 6384 at *13. "The NYCHRL further requires an independent liberal construction analysis . . . targeted to understanding and fulfilling . . . the City HRL's uniquely broad and remedial purposes." *Id.* (internal citations omitted). "To establish a discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her protected

characteristic," *Grimes-Jenkins v. Consol. Edison Co. of N.Y.*, 2017 U.S. Dist. LEXIS 77710 at *19 (SDNY 2017), "that she was treated differently from others in a way that was more than trivial, insubstantial or petty, at least in part for discriminatory reasons." (*Canty v. Department of Educ. of the City of N.Y.*, 2018 N.Y. Misc. LEXIS 346 at 7-8 (2018)).

The fourth element of a *prima facie* claim of employment discrimination under the State and City Human Rights Laws requires that plaintiff show she was terminated or treated differently under circumstances giving rise to an inference of race discrimination. *Askin v. Department of Educ. of the City of N.Y.*, 110 A.D.3d 621, 973 N.Y.S.2d 629 (1st Dep't 2013).

Here, Plaintiff is able to establish the *prima facie* elements for race discrimination under both the NYSHRL and NYCHRL in that:

(a)　**Plaintiff is a member of a protected class.** Plaintiff is of African American descent and, therefore, she is a member of a protected class (FAC ¶ 11).

(b)　**Plaintiff was qualified for her position.** Plaintiff was qualified for her position as Executive Administrative Assistant having held that position immediately prior to her termination in May/June 2018 (FAC ¶ 11). As an Executive Administrative Assistant, Plaintiff provided administrative support for JPM senior officers and back-up support in JPM's New York City executive offices where Dimon's office was located (FAC ¶ 12). Prior to the time period complained of herein, JPM consistently positively reviewed Plaintiff's work performance and issued reviews of "meets or exceeds expectations". (FAC ¶ 13). Notably, JPM never reprimanded or disciplined Plaintiff (FAC ¶ 13).

(c)　**Plaintiff suffered an adverse employment action.** Plaintiff suffered an adverse employment action when she experienced a hostile work environment, discrimination, retaliation, and, ultimately, termination, as detailed above.

(d)　**The adverse action faced by Plaintiff could be deemed discriminatory.** The adverse actions which could be deemed discriminatory include Plaintiff being treated dramatically

different than her non-African American colleagues in the terms and conditions of her employment, including, but not limited to, relegated to a subservient role and treated with derision, disrespect, and humiliation (FAC ¶¶ 32, 33, 35). Plaintiff brought her accusations of race discrimination to Dimon and numerous others within the organization without resolve. In those interactions, including direct communications with defendant Dimon, Plaintiff directly addressed the causal connection between the treatment she was receiving and her race, African American (FAC ¶¶ 72, 76-77, 83, 86, 100). Defendants cannot avail themselves of the garden-variety corporate defense that they did not know or were never informed of the discrimination. They knew. Plaintiff told them.

Plaintiff is not alleging that anyone at JPM referred to her using a racial epithet, made overtly racist remarks, or hung a noose in her work area. However, considering the totality of the circumstances Plaintiff was subjected to a more subtle form of race discrimination where she witnessed her non-African American colleagues being treated more favorably in the terms and conditions of employment. *See Lowery v. WMC-TV*, 658 F. Supp. 1240, 1244 (W.D. Tenn. 1987) (where the Court found subtle racism as a result of the African-American plaintiff having been placed in a no-win situation in order to excel at his job compared to his non-African American counterparts).

Plaintiff has established the *prima facie* elements of race discrimination. Accordingly, the motion to dismiss this claim must be denied.

## D. Plaintiff Has Pled Sufficient Facts to Sustain Her Claim for Retaliation Pursuant to the NYSHRL and the NYCHRL

To establish a claim for unlawful retaliation under the NYSHRL and the NYCHRL, a plaintiff need only plead that (1) she is engaged in a protected activity; (2) the employer was aware of the activity; (3) the employer took adverse action against the plaintiff, or under the NYCHRL,

the employer's actions were reasonably likely to deter the person from engaging in protected activity; and (4) a causal connection existed between the protected activity and the alleged retaliatory action. *Thomas v. Mintz*, 2018 N.Y. Misc. LEXIS 3282 (NY County 2018). "Protected activity refers to actions taken to protest or oppose statutorily prohibited discrimination." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 289, 308 (S.D.N.Y, 2009); *see also Brook v. Overseas Media, Inc.*, 69 A.D.3d 444 (1st Dep't 2010) (referring to protected activity under NYCHRL as 'opposing or complaining about unlawful discrimination.). "A causal connection must be established either indirectly, by showing that the adversity closely followed in time the protected activity, or directly, through evidence of retaliatory animus, such as verbal or written remarks." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2001).

"Like other provisions of the NYCHRL, the Restoration Act[3] requires that courts "construe [the NYCHRL] . . . broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible. It is important that the assessment [of a retaliation claim] be made with a keen sense of [the] realities [of circumstances surrounding the plaintiff]. Of the fact that the "chilling effect" of a particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities." *Bailey v. Brooklyn Hosp. Ctr.*, 2017 N.Y. Misc. LEXIS 24 at *19 (Jan. 4, 2017). In *Kaplan*, the Court reversed the lower court's dismissal of plaintiff's retaliation claim based on her allegation that her employment was terminated approximately two weeks after she informed her employer of her claims of sexual harassment.

---

[3]The Restoration Act is referring to The Local Civil Rights Restoration Act (Local Law 85 of 2005), which was passed to protect the vigor and independence of the NYCHRL against the attacks of an increasingly conservative state and federal judiciary. The bill—known as "Intro 22" as it made its way through the Council—simultaneously sent a strong message about the City's commitment to the preservation of civil rights and took practical and concrete steps to improve the efficacy of civil rights enforcement.

In the present case, Plaintiff can establish the *prima facie* elements of unlawful retaliation in that:

(a) **Defendants were clearly aware that Plaintiff was engaged in protected activity.** Plaintiff complained of the hostile work environment to the following individuals: her supervisor Paul Jensen ("Jensen"), Managing Director, Chief Administrative Officer and Head of Audit (FAC ¶ 37); Samantha Garber ("Garber"), Executive Director & Head of Audit, Human Resources (FAC ¶¶ 39, 46); Barrack Green ("Green"), Vice-President of Employee Relations, for him to investigate (FAC ¶ 49); Charity Blackburn ("Blackburn"), Vice-President, Employee Relations (FAC ¶ 52); nine (9) separate written communications to Dimon, (FAC ¶¶ 54, 66, 72-73, 76-79, 83-84, 86, 88-89, 97, 99-100); and Clarissa Ramos-Cafarelli ("Ramos-Cafarelli"), Managing Director of Employee Relations (FAC ¶ 70-71).

The adverse action taken against Plaintiff by the Defendants after she **complained of hostile work environment and discrimination clearly evidence a causal connection.** Following Plaintiff's complaints of hostile work environment and discrimination based on her race: (i) Jensen's responses to Plaintiff were terse and dismissive after she filed a complaint with Garber (FAC ¶¶ 39-40); (ii) Jarnigan spread false rumors about Plaintiff, including that Garber had to reprimand her in December 2016 (FAC ¶ 42): (iii) Jensen docked Plaintiff's pay for one week when she was actually at work (FAC ¶ 53); (iv) on or about April 24, 2017, Jensen denied Plaintiff's request for additional sick days requiring that she request emergency vacation from Garber (FAC ¶ 65); (v) Plaintiff was scheduled to return to work on July 12, 2017 but had yet to receive any assignment despite having been promised that a team of recruiters would work with her to find a new position (FAC ¶¶ 70, 74); (vi) by July 24, 2017, Plaintiff had yet to hear from anyone from the team of recruiters to help her find a new position (FAC ¶ 75); (vii) Plaintiff was portrayed as an "angry black woman who was a threat to herself and others; (FAC ¶ 78); (viii) rather than receiving help to find a new position within JPM, Plaintiff was given a severance

agreement (FAC ¶ 80); (ix) by September 12, 2017, Plaintiff had still not received any assistance from the team of recruiters to help her find a new position (FAC ¶ 82); (x) on or about November 3, 2017, Plaintiff was told she needed to go for a fitness for duty examination before she could return to work (FAC ¶¶ 87, 90-93); (xi) Plaintiff was offered a non-competitive position several levels below her grade, reporting to an individual with whom she had had difficulties in the past (FAC ¶¶ 101-102); (xii) Plaintiff was sent on a series of interviews for positions selected by JPM which were clearly beneath her experience and expertise (FAC ¶¶ 103-104); (xiii) Plaintiff received positive feedback on the job interviews she selected but was rejected for the position allegedly because she "lacked enthusiasm," which she strongly denied (FAC ¶¶ 106-107); (xiv) Plaintiff was threatened with employment termination if she was unable to find a position by May 29, 2018 (FAC ¶ 108); (xv) Plaintiff was charged with fraud by the New York Department of Labor for alleging her employment terminated on May 29, 2018 when JPM, which failed to notify Plaintiff otherwise, indicated that her employment terminated as of June 14, 2018 (FAC ¶¶ 111, 114).

In addition to the actions taken against Plaintiff, she can also show that these actions would have a deterrent effect on others engaging in protected activity as it had on Plaintiff for the vast majority of her career. Over the years, Plaintiff noticed the disparity in the terms and conditions of employment at JPM between African American employees and their non-African American counterparts, including promotional opportunities, compensation and other perquisites of JPM employment (FAC ¶ 22). Plaintiff never spoke out about these disparities publicly or filed internal complaints as she had seen other African American employees who objected to JPM's discriminatory practices face adverse consequences (FAC ¶ 23). As her reward for not speaking out, Plaintiff was the only African American employee who worked in the executive office suite because, as she was told, she was not like the others, meaning her African American colleagues (FAC ¶ 23). In a letter to Dimon, dated October 11, 2017, Plaintiff recounted that "People are

scared to speak up because they do not want to end up like me, fired on unemployment with no resolution." (FAC ¶ 86).

Plaintiff has met the *prima facie* elements for retaliation pursuant to the NYSHRL and the NYCHRL. Therefore, that branch of Defendants' motion seeking to dismiss her claim for retaliation for having complained about a racially hostile and discrimination work environment must be denied.

As Plaintiff has sufficiently established claims for race-based hostile work environment, discrimination, and retaliation upon which relief can be granted, the Court should deny defendants' motion.

## POINT II

## DIMON, AN OWNER OF JPM WHO COULD HIRE AND FIRE AND WHO AIDED AND ABETTED UNLAWFUL CONDUCT, CAN BE FOUND LIABLE UNDER BOTH THE NYSHRL AND NYCHRL

"Individuals may be held liable under NYSHRL if they have an 'ownership interest in the employer or the authority to hire or fire employees.'" *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 156-157 (EDNY 2014); *see also* NY EXEC. LAW § 296(1); *Adams v. Delta Airlines, Inc.*, 2017 U.S. Dist. LEXIS 208639 (EDNY Dec. 18, 2017) (where the court held that the former CEO of Delta likely qualified as an employer who had ownership interest or had the authority to hire and fire). If a plaintiff proves that the "individual had the ability to do more than carry out personnel decisions, including the power to hire and fire employees and supervise and control employee conditions of employment," he need not prove "that this individual actually used such powers against the plaintiff." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 373 (EDNY 2012). Moreover, the plaintiff must show that the individual had some minimal culpability." *Marchuk v. Farugi & Farugi, LLP*, 100 F. Supp. 3d 302, 309 (SDNY 2015) or connection underlying the claim. *Figueroa v. Rsquared NY, Inc.*, 89 F. Supp. 3d 484, 493 (EDNY 2015). *See*

- 21 -

*also Magnotti v. Crossroads Healthcare Mgt., LLC*, 126 F. Supp.3d 301, 314 (EDNY 2015) (where the court denied defendants' motion to dismiss upon finding that it was plausible that the individual defendant was involved or at least condoned the actions against plaintiff having known about plaintiff's condition, received regular updates and was included in correspondence regarding plaintiff's employment).

The NYSHRL and NYCHRL also provide for aiding and abetting liability. *See* NY EXEC. LAW § 296(6), NYC Admin. Code § 8-107(6). To be held liable under these provisions "an individual employee need not himself take part in the primary violation, he need only aid, abet, incite, coerce or compel a primary violation of the HRL committed by another employee or the business itself." *Lewis v. Triborough Br. & Tun. Auth.*, 77 F. Supp. 2d 376, 380-81 (SDNY 1999) (courts have refused to dismiss aiding and abetting claims against supervisors who were informed about offensive conduct but failed to take appropriate investigative or remedial measures."); *see also EEOC v. Suffolk Laundry Servs., Inc.,* 48 F. Supp. 3d 497, 522 (EDNY 2014) (liability can be based on condonation or tacit acceptance). "A supervisor's failure to take adequate remedial measures in response to a complaint of discrimination has been deemed 'actual participation' under NYSHRL § 296(6)." *Parra v. City of White Plains*, 48 F. Supp.3d 542, 555 (SDNY 2014); *see also Kellman v. Metro Transp. Auth.*, 8 F. Supp. 3d 351, 393 (SDNY 2014) ("Liability may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct" *Smith v. Town of Hempstead Dep't of Sanitation Sanity Dist. No. 2*, 798 F. Supp. 2d 443, 456 (EDNY 2011) (denying summary judgment where the plaintiffs primarily point to a single piece of undisputed evidence allegedly showing that a defendant saw the discriminatory act and failed to report it to anyone or to take any remedial action); *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (NDNY 2010)

(denying summary judgment because supervisor ignoring, writing off, discouraging, and failing to investigate the plaintiff's complaints could amount to acquiescence in and aiding and abetting the creation of a hostile work environment).

In *Nokaj v. North E. Dental Mgt., LLC*, 2019 U.S. Dist. LEXIS 24396 (SDNY Feb. 14, 2019), plaintiff charged her supervisor with aiding and abetting violations of the employer's sexual harassment policy when the supervisor, who witnessed two instances of plaintiff being sexually harassed and received an unspecified number of informal complaints from plaintiff on the same subject without having reported the conduct to anyone more senior. The Court concluded that determining aiding and abetting would be left for the jury, not the court, after weighing the proffered testimony. *See also Chen v. Shanghai Café Deluxe, Inc.*, 2019 U.S. Dist. LEXIS 46330 (SDNY Mar. 8, 2019) (where the court denied defendants' motion to dismiss based on triable issues of fact against two named defendants, where both were owners of the business, had the authority to terminate employees, and may have participated in the alleged discriminatory conduct).

In *Delisi v. Nat'l Ass'n of Prof'l Women, Inc.*, 48 F. Supp. 3d 492, (EDNY 2014), the Court held that defendant's general counsel could be held individually liable in light of the plaintiff having first complained to him about sexual harassment, he ignored the complaints and the harassment continued until plaintiff took a medical leave of absence and filed a complaint with the Equal Employment Opportunity Commission. When plaintiff returned from her medical leave, she again complained to the general counsel, who called her a liar and took no action to remediate the situation. The Court stated, "[A]ssuming these facts to be true, the Court finds that they sufficiently alleged that Wesser [general counsel] "actively participated" in conduct of discrimination or retaliation to support an aiding and abetting claim under § 296(6)." *Id*. at 496.

Since December 31, 2006, Dimon has been Chief Executive Officer of the JPM Board and, since December 31, 2015, he has been Chief Executive Officer and President of JPM (FAC ¶ 6). During all times relevant to this Complaint, Dimon, as a member of upper management with an ownership interest in JPM, had the authority to hire and fire employees (FAC ¶ 7; Tolchin Decl.., **Exhibit C**). In fact, during his Town Hall meetings with employees, Dimon made clear his influence over employees when he repeatedly stated that he reads every email and he should be contacted if there are any issues which an employee has been unable to resolve (FAC ¶ 18). Dimon further stated that he cannot provide assistance if he is not aware of the problem (FAC ¶ 19). Based on these representations and Plaintiff's belief that Dimon was sincere that he would intervene where an employee's concerns were not addressed, Plaintiff contacted him for his intervention (FAC ¶ 55). Over the next year, Plaintiff repeatedly reached out for Dimon's assistance with no response. The numerous instances are laid out in plaintiff's Complaint (FAC ¶¶ 54, 66, 72, 77-79, 83, 86, 97, 100).

Plaintiff contacted Dimon on at least nine (9) separate occasions to bring to his attention the race discrimination, harassment and retaliation she was facing by JPM representatives. Plaintiff contacted Dimon based on his representation that he should be contacted where an employee has not received any satisfaction and that he reads all of his emails. At no time throughout this ordeal, did Dimon contact Plaintiff or have his representative contact Plaintiff on his behalf. Instead, there was just silence. Dimon's failure to address Plaintiff's complaints is a condoning of the behavior to which she was subjected. As such, Dimon should be liable pursuant to both the NYSHRL and the NYCHRL as an aider and abettor of the illegal conduct.

**POINT III**

**DISCOVERY SHOULD NOT BE STAYED**

This action was initially commenced nearly two years ago and has been kicked from one court to another, from State Court to one Federal Court to another Federal Court—and in all this time not a stitch of discovery has been had. To date, Defendants have not even provided Plaintiff's personnel file which would cost them nothing to produce, contrary to their bellyaching about how much discovery would cost. Defendants' Rule 12(c) motion to "stay discovery" is brand new in this two-year-old action and is just a roadblock to the truth. If Defendants do not wish to depose the Plaintiff as this time, that is certainly their right. However, Plaintiff should not be delayed in deposing all the Defendants and their witnesses, especially under the realities of the Covid-19 pandemic, people are changing jobs and relocating and memories are fading.

**CONCLUSION**

As set forth herein, Defendants' Motion to Dismiss must be denied in its entirety as (a) Plaintiff has established sufficient facts to support her claims for race-based hostile work environment, discrimination, and retaliation; and (b) Dimon can be held liable pursuant to the NYSHRL and NYCHRL; and (c) discovery shall not be stayed.

Dated: July 29, 2020

Respectfully submitted,

JAROSLAWICZ & JAROS PLLC

_/s/ David Tolchin_