```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
WANDA WILSON,                                                    :
                                                                 :
                                                                 :
                        Plaintiff,                               :
                                                                 :     20-CV-4558 (JMF)
            -v-                                                  :
                                                                 :     OPINION AND ORDER
JPMORGAN CHASE BANK, N.A., JAMES DIMON,                          :
JANE AND JOHN DOE(S) 1-10, and XYZ ENTITIES 1                    :
TO 10,                                                           :
                        Defendants.                              :
                                                                 :
-----------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

      Plaintiff Wanda Wilson, an African-American woman, worked for Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") for over twenty years, most recently as an Executive Administrative Assistant. In April 2017, after months of tension with some of her colleagues, Wilson was admitted to the hospital and placed on suicide watch. Following a period of disability leave, Wilson searched unsuccessfully for a new position within JPMorgan. Eventually, her employment was terminated. In this suit, Wilson brings claims of discrimination and retaliation (and aiding and abetting the same) against JPMorgan and James Dimon — JPMorgan's Chief Executive Officer and Chair of the Board — under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law. § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* She does not bring any claims under federal law. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Wilson's claims. *See* ECF No. 60. For the reasons that follow, Defendants' motion is granted and Wilson is granted leave to amend.

**BACKGROUND**

The following facts are drawn from the Amended Complaint, ECF No. 20 ("Compl."), and are assumed to be true for purposes of this motion. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

As noted, Wilson is an African-American woman who worked at JPMorgan for over twenty years, most recently as an Executive Administrative Assistant in JPMorgan's New York City executive offices. Compl. ¶¶ 11-12. Wilson's employment with JPMorgan played a "substantial role in her life and how she defined herself," and she was proud of her professional achievements there. *Id.* ¶¶ 20-21. "Over the years," however, "Wilson noticed [a] disparity in the terms and conditions of employment at [JPMorgan] between African American employees and their non-African American counterparts, including promotional opportunities, compensation, and other perquisites of . . . employment." *Id.* ¶ 22. But Wilson never spoke out about these disparities either publicly or internally. *Id.* ¶ 23. "As her reward for not speaking out, . . . Wilson was the only African American employee who worked in the executive office suite because, as she was told" — by whom the Amended Complaint does not say — "she was not like the others, meaning her African American colleagues." *Id.* ¶ 24.

According to the Amended Complaint, Wilson's own experience changed for the worse around March 2016, when she was assigned to serve as Executive Administrative Assistant to Managing Director Paul Jensen. *Id.* ¶¶ 27, 31. Around the same time, Executive Director Janet Jarnagin[1] was assigned to serve as Team Leader under Jensen. *Id.* ¶ 28. Although the three initially worked well together, Wilson was eventually "relegated to a more subservient role" as

---

[1]   As Defendants note in their memorandum of law, the Amended Complaint incorrectly spells Jarnagin's last name "Jarnigan." *See* ECF No. 61 ("Defs.' Mem."), at 3 n.2.

Jensen and Jarnagin developed a closer working relationship, and Jarnagin began treating Wilson in a "demeaning" manner. *Id.* ¶¶ 29, 31, 35. For example, Jarnagin ordered Wilson to bring her lunch and offered Wilson's administrative services to JPMorgan's consultants and third parties without asking whether Wilson was available. *Id.* ¶ 32. This treatment was "dramatically different" from the manner in which Jarnagin interacted with "the non-African American Executive Administrative Assistants with whom [she] worked." *Id.* ¶ 33.

Eventually, Wilson complained to Jensen about Jarnagin's behavior, but Jensen "accused [Wilson] of being 'a bit dramatic' and refused to intervene." *Id.* ¶¶ 36-37. Wilson then filed a complaint with Human Resources seeking "to remediate the hostile work environment." *Id.* ¶ 38. "As a result of her filing a complaint," Wilson "noticed a dramatic change in Jensen's attitude toward her": He "began questioning her work," treating her "with distrust," and responding to her in a "terse and dismissive" manner. *Id.* ¶¶ 39-40. Meanwhile, Jarnagin continued to treat Wilson poorly. For example, Wilson learned that Jarnagin had "spread[] false rumors about her" to their colleagues, and Jarnagin "mockingly" referred to the stack of folders between her desk and Wilson's as "the Mexican/U.S. wall." *Id.* ¶¶ 42-43.

Months of tension came to a head on or about April 5, 2017, when Wilson took a sick day and filed a second complaint with Human Resources. *Id.* ¶ 46. JPMorgan's Employee Assistance Program referred Wilson to a therapist and escalated Wilson's complaint through various levels of the corporate hierarchy. *Id.* ¶¶ 48-51. Around April 17, 2017 — frustrated that she had "followed her chain of command without success" — Wilson wrote a letter to Dimon, "seeking his assistance to remediate the hostile work environment." *Id.* ¶¶ 54-55. Dimon had previously hosted JPMorgan "Town Hall[]" events, at which he told employees "that he reads every email" and that they should contact him "if there [we]re any issues which [they were]

unable to resolve." *Id.* ¶ 18.  Wilson complained in her letter to Dimon that Jensen had unlawfully docked one week of Wilson's pay and that Jarnagin had reported Wilson for using Jensen's office phone while he was away on vacation, which Wilson had always been permitted to do.  *Id.* ¶¶ 56-57.

On the same day, Wilson returned to work, where she "spent most of the day in the bathroom crying, praying, and throwing up" after learning that Jensen had been informed of her letter to Dimon.  *Id.* ¶ 60.  The next day, Wilson left work early, and the day after that, she was admitted to the hospital with chest pains, high blood pressure, and breathing issues; she was eventually transferred to the hospital's psychiatric unit and put on suicide alert.  *Id.* ¶¶ 62-64.  On or about April 24, 2017, Wilson wrote another letter to Dimon, requesting his help.  *Id.* ¶¶ 66-67.  Wilson ultimately took disability leave through July 2017, which JPMorgan approved after her therapist advised that she could not return to the same working environment without risking a relapse.  *Id.* ¶ 68.

Wilson was "ready to return to work as of July 7, 2017," *id.* ¶ 69, and she began a long and ultimately unsuccessful search for a new position within JPMorgan, the details of which are not particularly relevant for purposes of this motion.  In broad strokes, Wilson was promised in early July that a team of recruiters would work with her to help her find a new position, but by September 12, 2017, she still had not heard from anyone (although she did continue to be paid).  *Id.* ¶¶ 70, 82.  Meanwhile, around August 23, 2017, Wilson received a severance agreement, which she did not want to sign, preferring "to return to work in a position which was comparable to the salary, responsibilities[,] and location where she had most recently worked."  *Id.* ¶¶ 80, 98.  At one point, Wilson was told that she needed to be evaluated for her fitness to work and submit medical records relating to the condition that had prompted her disability leave, which she

4

viewed as an unnecessary measure designed to "further harass her." *Id.* ¶¶ 87-93. In December 2017, Wilson was finally connected with a JPMorgan recruiter and traveled to New York for what she understood to be an in-person meeting, in spite of her illness and inclement weather. *Id.* ¶¶ 94-96. Upon arriving, however, Wilson learned that the recruiter had intended to speak with her by telephone, not in person. *Id.* ¶ 96. Throughout this time period, Wilson continued to send letters and emails to Dimon, in which she complained of JPMorgan's "[r]acis[t]" and "[d]iscriminatory" handling of her situation. *Id.* ¶¶ 76-77, 83-84, 86-89, 97, 99-100.

Around March 9, 2018, Wilson was offered a new position, which she declined because it was at a lower level than her prior role and would have required her to "report[] to an individual with whom she had had difficulties in the past." *Id.* ¶¶ 101-02. Wilson then interviewed for a series of other jobs within JPMorgan, some of which the company selected and some of which she selected, but she was not offered any of the positions because of a perceived "lack of enthusiasm," which Wilson "strongly denied." *Id.* ¶¶ 103-07. On May 24, 2018, Wilson received a letter advising that her employment would terminate on May 29, 2018, if she was unable to find a new position within JPMorgan or if she was not retained in an unpaid status. *Id.* ¶ 108. Believing that her employment had in fact terminated when that date passed, Wilson applied for and began receiving unemployment benefits. *Id.* ¶¶ 109-10. The New York Department of Labor later charged Wilson with fraud, having been informed by JPMorgan that Wilson's employment had actually terminated on June 14, 2018 — a fact that JPMorgan did not directly convey to Wilson until after she had already filed for unemployment benefits. *Id.* ¶¶ 109-15.

Wilson filed suit against Defendants in New Jersey state court on August 1, 2018, bringing claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann.

5

§ 10:5-1 *et seq.*, and New Jersey common law.  *See* ECF No. 1-1.  Thereafter, Defendants removed the case to the United States District Court for the District of New Jersey.  *See* ECF No. 1.  The court there eventually dismissed all claims in Wilson's original Complaint on the ground that she had worked for JPMorgan exclusively in New York and New Jersey substantive law thus did not apply.  *See Wilson v. JPMorgan Chase*, No. 18-CV-13789 (JMV) (JBC), 2019 WL 4072933, at \*5-6 (D.N.J. Aug. 28, 2019) (ECF No. 18).  The court granted Wilson leave to amend, which she did — eventually filing the operative Amended Complaint, which pleads claims under the NYSHRL and the NYCHRL.  *See* Compl. ¶¶ 116-59.  Defendants filed a motion to dismiss the Amended Complaint or, alternatively, to transfer venue to this Court.  *See* ECF No. 23.  The New Jersey district court granted the motion to transfer venue, and did not reach Defendants' motion to dismiss for failure to state a claim.  *See Wilson v. JPMorgan Chase*, No. 18-CV-13789 (JMV) (JBC), 2020 WL 3168539, at \*4 (D.N.J. June 15, 2020) (ECF No. 34).  Following transfer, Defendants renewed that motion.  *See* ECF No. 60.

## SUBJECT-MATTER JURISDICTION

Before the Court turns to the merits, a brief word with respect to subject-matter jurisdiction is warranted.  In removing this case from New Jersey state court, Defendants invoked the federal courts' diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), but their Notice of Removal contained only a bare allegation that "the amount in controversy exceeds $75,000.00, exclusive of interest and costs."  ECF No. 1, ¶ 5.  Further, the original Complaint did not seek damages in any specific amount.  *See* ECF No. 1-1, at 25.  In light of its independent obligation to confirm subject-matter jurisdiction, *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), the Court directed the parties to show cause whether Defendants had carried their burden of establishing that the amount in controversy exceeded $75,000 at the time of removal, *see* ECF

No. 69; 28 U.S.C. § 1446(c)(2)(B).  The parties contend that removal was proper and the Court has subject-matter jurisdiction because, among other things, Wilson's annual base salary as of January 28, 2018, was $96,616 and she seeks lost earnings since her termination in June 2018. *See* ECF Nos. 70-2, at 1-2; ECF No. 71; *see also* ECF No. 70-1.

The Court agrees.  Because removal jurisdiction, once attached, cannot be destroyed "by amendment of [the] pleadings," *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 292 (1938), the Court must consider the amount in controversy at the time of removal and in light of Wilson's original claims under the NJLAD.  Nevertheless, the Court may consider the parties' supplemental submissions alongside the original pleadings in determining whether the amount-in-controversy requirement was satisfied at the time of removal.  *See, e.g.*, *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014); *United Food & Commercial Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 305 (2d Cir. 1994).  At least one federal court has held that claims under the NJLAD satisfied the $75,000 amount-in-controversy requirement where the plaintiff's salary was $66,885.63, considering potential punitive damages and attorney's fees.  *See Uddin v. Sears, Roebuck & Co.*, No. 13-CV-6504 (JLL), 2014 WL 316988, at *5 (D.N.J. Jan. 27, 2014); *see also Rodriguez v. Burlington Cnty. Corr. Dep't*, No. 14-CV-4154 (NLH) (JS), 2015 WL 790521, at *3 (D.N.J. Feb. 25, 2015).  Moreover, juries have awarded damages well in excess of $75,000 for certain successful NJLAD claims.  *See, e.g.*, *Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396, 424-25 (D.N.J. 1996), *aff'd*, 174 F.3d 95 (3d Cir. 1999); *see also Rendine v. Pantzer*, 661 A.2d 1202, 1205, 1232 (N.J. 1995).  Considering these cases and the evidence regarding Wilson's salary, the Court concludes that the amount in controversy did exceed $75,000 at the time of removal.  And it is readily apparent that the diversity requirement was satisfied: Wilson is a citizen of New Jersey; JPMorgan is a national

7

banking association whose main office, as set forth in its articles of association, is in Ohio; and Dimon is a citizen of New York.  *See* ECF No. 1, ¶¶ 6-8; *see also* 28 U.S.C. § 1348; *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006).  Thus, the Court is satisfied that it has subject-matter jurisdiction.

## DISCUSSION

In evaluating Defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all facts set forth in the Amended Complaint as true and draw all reasonable inferences in Wilson's favor.  *See, e.g., Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.  Where, as here, a plaintiff brings claims of employment discrimination, however, the facts alleged in the complaint "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination.  They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87 (2d Cir. 2015).

As noted, Wilson brings all of her claims under the NYSHRL and NYCHRL; she alleges no claims under federal law. Specifically, she alleges a race-based hostile work environment; other forms of race discrimination; and retaliation. She also brings aiding-and-abetting claims against Dimon. The Court will address each in turn.

**A. Hostile Work Environment**

To state a hostile work environment claim under the NYSHRL, a plaintiff must plead facts showing that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult[] that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) ("Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard."). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). To determine whether a plaintiff has adequately stated a claim, a court "must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321. Additionally, "[i]t is axiomatic that the plaintiff . . . must show that the hostile conduct occurred *because of* a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (emphasis added). The burden to state a claim under the NYCHRL is somewhat less demanding, requiring only an allegation that the plaintiff "was 'treated less well than other employees because of' his [or her] membership in a protected class." *Ardigo v. J. Christopher Capital, LLC*, No. 12-CV-3627 (JMF), 2013 WL 1195117, at *4 (S.D.N.Y. Mar. 25, 2013) (quoting *Williams v. New York City*

9

*Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).  Severe or pervasive hostility is not required, and "even a single comment may be actionable in the proper context."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).  "Nevertheless, the NYCHRL is not a general civility code[,] and when the conduct alleged is far from a borderline violation of the NYSHRL, then the plaintiff has failed to state a claim under the NYCHRL, as well."  *South v. Cont'l Cas. Co.*, No. 15-CV-1627 (WHP), 2017 WL 782909, at *7 (S.D.N.Y. Feb. 28, 2017) (internal quotation marks omitted).

Measured against these standards, Wilson's NYSHRL hostile work environment claim fails for at least two reasons.  First, although she satisfies the subjective prong of the analysis given the mental and physical health effects that she alleges Jarnagin's mistreatment caused, *see* ECF No. 63 ("Pl.'s Opp'n"), at 14, the conduct she alleges was not severe or pervasive enough that a reasonable person would have found it hostile or abusive.  It may have been inappropriate, offensive, or disrespectful of Jarnagin to order Wilson to bring her lunch, offer Wilson's administrative services to others without proper authorization, spread false rumors about Wilson to colleagues, and mockingly refer to the stack of folders between their desks as "the Mexican/U.S. wall."  Without more, however, these allegations are not enough to state a hostile work environment claim under the state statute.  *See, e.g.*, *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (summary order) (holding that allegations that defendants "wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her . . . d[id] not support a finding of a hostile work environment that [wa]s pervasive or severe"); *cf. Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (noting that "harsh, unjust, and rude" behavior in the workplace, standing alone, is not actionable).

10

In any event, Wilson's NYSHRL hostile work environment claim fails for a second reason, which also dooms her corresponding claim under the NYCHRL: because she does not plausibly allege that she was treated poorly "at least in part '*because of*'" her race. *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 39 (1st Dep't 2009)). Wilson does plead that Jarnagin's treatment of her "was dramatically different than her treatment of the non-African American Executive Administrative Assistants with whom [Jarnagin] worked." Compl. ¶ 33. But she offers no facts to back up this conclusory assertion. A NYCHRL plaintiff "can raise an inference of a discriminatory motive in a number of ways, including by . . . pleading *specific facts* suggesting that other, similarly situated employees outside of the plaintiff's protected class were treated better than the plaintiff." *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019) (emphasis added). Wilson's threadbare allegations of disparate treatment do not meet that standard. *Cf. Anderson v. City of New York*, No. 16-CV-1051 (GBD) (KHP), 2017 WL 9538862, at *17 (S.D.N.Y. Jan. 19, 2017) (holding that the plaintiff had narrowly stated a NYCHRL hostile work environment claim by alleging that a defendant "refused to meet with Plaintiff because she was too busy, but met with at least one of Plaintiff's female coworkers for the same purpose"), *report and recommendation adopted*, 2017 WL 3251603 (S.D.N.Y. July 31, 2017); *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2014 WL 1259616, at *3, *11 (S.D.N.Y. Mar. 24, 2014) (denying a motion to dismiss a NYCHRL hostile work environment claim where the plaintiff alleged that he "was treated 'less well' than younger, less qualified employees" and provided specific examples, such as inequitable distribution of overtime opportunities and work assignments).

Notably, Wilson concedes that she "was not subjected to an overt display of racism." Pl.'s Opp'n 2. She argues that this fact "is not dispositive" because "courts are moving away

from traditionally defined racism to acknowledge spectrums of conscious and subconscious, overt and covert, obvious and subtle actions that constitute racial harassment." *Id.* at 14 n.2 (citing Pat K. Chew, *Seeing Subtle Racism*, 6 Stan. J. C.R. & C.L. 183 (2010)).  Courts have indeed increasingly come to recognize that discrimination can take more subtle forms.  *See, e.g.*, *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608-09 (2d Cir. 2016) (observing that "[r]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implication," even absent "explicitly racial language" (internal quotation marks omitted)).  But that recognition is no aid to Wilson here.  Conclusory assertions aside, she fails to plead that any of the harassment she allegedly suffered was racially motivated, even implicitly.  The closest she comes is when she alleges that she "was told . . . she was not like the others, meaning her African American colleagues," Compl. ¶ 24, and when she refers to a "security stunt where she was portrayed as an 'angry black woman' who was a threat to herself and others," *id.* ¶ 78.  But without more particulars ("was told" by whom? told what exactly? what sort of "security stunt"? how and by whom was she portrayed as an "angry black woman"?), these allegations are not enough to nudge Wilson's claim across the plausibility line.

**B.  Race Discrimination**

The Court turns next to Wilson's other race discrimination claims under the NYSHRL and the NYCHRL.  These claims are analyzed under the three-step burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).[2]  At the motion to dismiss

---

[2]   Strictly speaking, it is "unclear whether, and to what extent, the McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims." *Mihalik*, 715 F.3d at 110 n.8.  Nevertheless, courts in this Circuit "[t]ypically . . . apply the liberal standards of the NYCHRL to

stage, however, only the first step of that framework — namely, the plaintiff's burden to allege a *prima facie* case of discrimination — is at issue.  Thus, to state a claim of race discrimination under the NYSHRL, the plaintiff must plead "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) [that she] can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311 (emphasis omitted).  Once again, claims under the NYCHRL are subject to a more liberal standard, requiring only plausible allegations that the plaintiff "was subjected to unequal treatment because of her protected characteristic."  *Thomson v. Odyssey House*, No. 14-CV-3857 (MKB), 2015 WL 5561209, at *24 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) (summary order).  That is, the NYCHRL does not require a "materially adverse employment action."  *Mihalik*, 715 F.3d at 114.

Wilson's claim is that she "was subjected to race discrimination in light of her less experienced non-African American colleagues receiving higher pay, promotions and other opportunities which were denied to her as a member of the African American race."  Compl. ¶ 130.  To establish a *prima facie* case of discrimination in that manner, Wilson must plead facts from which a jury could "plausibl[y]" infer that "the comparators [we]re similarly situated." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011); *see Henderson v. Physician Affiliate Grp. of N.Y.*, No. 18-CV-3430 (JMF), 2019 WL 3778504, at *4-5 (S.D.N.Y. Aug. 12, 2019) (applying this requirement to discrimination claims under the NYSHRL and NYCHRL); *accord McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001);

---

the basic *McDonnell Douglas* framework."  *Jeune v. City of New York*, No. 11-CV-7424 (JMF), 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (alterations and internal quotation marks omitted).

*Dooley v. JetBlue Airways Corp.*, No. 14-CV-4432 (JMF), 2015 WL 1514955, at *3 (S.D.N.Y. Apr. 1, 2015), *aff'd in relevant part*, 636 F. App'x 16, 20 (2d Cir. 2015) (summary order). More specifically, she must allege that her responsibilities and credentials were similar to those of her comparators. *See, e.g.*, *Torre v. Charter Commc'ns, Inc.*, No. 19-CV-5708 (JMF), — F. Supp. 3d —, 2020 WL 5982684, at *4 (S.D.N.Y. Oct. 8, 2020); *Craven v. City of New York*, No. 19-CV-1486 (JMF), 2020 WL 2765694, at *5 (S.D.N.Y. May 28, 2020). She fails to do so. Indeed, she does not "identify any particular 'comparators.'" *Lopez v. Advantage Plumbing & Mech. Corp*, No. 15-CV-4507 (AJN), 2016 WL 1268274, at *4 (S.D.N.Y. Mar. 31, 2016). Nor does she plead any facts suggesting the basis for believing that any of her non-African-American colleagues received higher pay or more substantial opportunities than she did. Accordingly, Wilson's remaining discrimination claims must be and are dismissed. *See Littlejohn*, 795 F.3d at 311.

**C. Retaliation**

Wilson's last substantive claims are for retaliation. They too are analyzed under the *McConnell Douglas* framework. *See Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 410 (2d Cir. 2011) (summary order); *see also Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."). To establish a *prima facie* case of unlawful retaliation under the NYSHRL, "an employee must show that (1) he [or she] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Rivera*, 743 F.3d at 24 (internal quotation marks and alteration omitted). The elements of a *prima facie* case of retaliation under the NYCHRL are analogous,

"except that the plaintiff need not prove any 'adverse' employment action; instead, he [or she] must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon v. Columbia Univ. Med. Ctr.*, No. 11-CV-8559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted). Under both statutes, protected conduct includes opposing or complaining about unlawful discrimination. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (2004).

Wilson's retaliation claims under both statutes founder on the fourth element: causation. She alleges that after she complained of a race-based hostile work environment to JPMorgan "upper managers" (including Dimon) — thereby satisfying the first and second elements of the standard under both statutes — Defendants retaliated against her in various ways:

> (a) Jensen's increasing hostility toward her, (b) Defendants' allowing the hostile and discriminatory environment to persist by refusing to take any action to address her complaints, (c) offering her a separation agreement instead of finding her a position when she was able to return to work following her medical leave of absence, (d) when she rejected the separation agreement, demanding she be submit to a fitness for duty examination after labeling her an "angry black woman["] who allegedly threatened violence against a [JPMorgan] employee, (e) terminating her employment after interfering with her ability to find a position when she was able to return to work, and (f) failing to advise [her] of her actual terminating date resulting in her being charged with fraud by the New York Department of Labor.

Compl. ¶¶ 146-47; *see also id.* ¶ 141. But she fails to allege a plausible causal connection between any of these actions (which the Court assumes without deciding would satisfy the third prong of the *prima facie* standard for each statute) and her protected activities. The Court will address each alleged form of retaliation in turn.

First, Wilson fails to plausibly allege a connection between her complaints and Jensen's "increasing hostility" because she alleges that the hostility predated her complaints. It is well established that "an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation [under the NYCHRL] because, in that

15

situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct." *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (1st Dep't 2012); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) (same with respect to the NYSHRL).  That is the case here: The Amended Complaint alleges that, even before her complaints, Wilson had been treated as less of "an integral member of [Jensen's] team."  *Id.* ¶¶ 31, 36-38.  Indeed, this shift into a "more subservient role" is one of the bases for Wilson's argument that she was subjected to hostile work environment in the first place.  *See* Pl.'s Opp'n 5 (citing Compl. ¶¶ 30-31).  Meanwhile, Defendants' alleged refusal to address Jensen's hostility and the discriminatory environment does not support a retaliation claim because an employer's failure to investigate complaints of discrimination cannot, as a matter of law, demonstrate retaliation for making those very complaints.  *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010); *see also Torre*, 2020 WL 5982684, at *7 (applying *Fincher* to NYSHRL and NYCHRL retaliation claims).

Finally, Wilson's remaining allegations do not permit an inference of causation because they occurred too long after Wilson's protected activity and she pleads no other facts from which to infer a causal connection between the two.  Under such circumstances — that is, when a plaintiff relies solely on temporal proximity to establish causation — "the temporal proximity must be very close."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted) (Title VII); *see also Moore v. Verizon*, No. 13-CV-6467 (RJS), 2016 WL 825001, at *15 (S.D.N.Y. Feb. 5, 2016) (Sullivan, J.) (NYSHRL and NYCHRL).  Although the precise degree of proximity required is a flexible, fact-specific inquiry, *cf. Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), district courts

16

in this Circuit have generally held that an interval of two to three months is too long to support an inference of causation, even under the NYCHRL, *see Moore*, 2016 WL 825001, at *15 (citing cases). Here, Wilson first complained about a hostile work environment to Jensen and to JPMorgan's Human Resources department sometime before April 4, 2017. *See* Compl. ¶¶ 36-42. She sent her first letters to Dimon in April 2017. *Id.* ¶¶ 54, 66-67. More than four months later, around August 23, 2017, Wilson was presented with a severance agreement. *Id.* ¶ 82. Over two months after that, on November 3, 2017, she was told that she would need to complete a fitness-for-duty evaluation before returning to work, *id.* ¶ 87, and approximately fourteen months after her first complaint, on June 14, 2018, she was terminated — allegedly without having been accurately informed of her termination date, *id.* ¶ 109.[3] Without additional allegations, each of these events occurred too long after Wilson complained of discrimination to support an inference of retaliatory causation.

## D. Aiding and Abetting

Finally, Wilson also sues Dimon in his individual capacity for "aid[ing] and abet[ting] the hostility, discrimination, and retaliation" that she faced by "fail[ing] to take any action to address [her] complaints." *See* Compl. ¶¶ 156, 165. These claims are easily dismissed, as "there can be

---

[3] Plaintiff did continue to write letters and emails to Dimon over the course of the following months, which were closer in time to some of the alleged adverse employment actions. *See* Compl. ¶¶ 72, 76, 82-83, 86-87. "In the absence of *any* other evidence of retaliation, however, the Court concludes that temporal proximity is not enough to nudge Plaintiff's claims across the line from conceivable to plausible." *Febrianti v. Starwood WorldWide*, No. 15-CV-0635 (JMF), 2016 WL 502027, at *5 (S.D.N.Y. Feb. 8, 2016) (internal quotation marks and alterations omitted), *appeal dismissed sub nom. Febrianti v. Gritt*, No. 16-702, 2016 WL 11005043 (2d Cir. July 7, 2016). Moreover, the Amended Complaint contains zero allegations connecting these communications or Dimon, either directly or indirectly, to the allegedly retaliatory decisions. Notably, approximately seven months passed between Plaintiff's final letter to Dimon and her eventual termination. *See* Compl. ¶¶ 88, 109.

no liability for aiding and abetting" under either the NYSHRL or NYCHRL absent "a primary violation." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. Nevertheless, mindful that leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and that it is "within the sound discretion of the district court to grant or deny leave to amend," *Ahmed v. GEO USA LLC*, No. 14-CV-7486 (JMF), 2015 WL 1408895, at *5 (S.D.N.Y. Mar. 27, 2015) (internal quotation marks omitted), the Court exercises its discretion and grants Wilson leave to amend. Put simply, the Court concludes that Wilson may be able to allege sufficient additional facts to remedy at least some of the defects in her claims (e.g., by adding more of the particulars to the allegations in Paragraphs 24 and 78). Wilson shall file any Second Amended Complaint **within thirty days of the date of this Opinion and Order**. Should she fail to do so by that date, the Court will dismiss the case without further notice.

The Clerk of Court is directed to terminate ECF No. 60.

SO ORDERED.

Dated: March 10, 2021
New York, New York

_____
JESSE M. FURMAN
United States District Judge