UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                  :
WANDA WILSON,                                                     :
                                                                  :
                          Plaintiff,                             :
                                                                  :                    20-CV-4558 (JMF)
             -v-                                                  :
                                                                  :                    OPINION AND ORDER
JPMORGAN CHASE BANK, N.A. et al.,                                :
                                                                  :
                          Defendants.                            :
                                                                  :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiff Wanda Wilson, an African American woman who worked for Defendant

JPMorgan Chase Bank, N.A. ("JPMorgan") for over twenty years, alleges that JPMorgan

wrongfully discriminated against her in violation of state and local law.  More specifically,

Wilson brings hostile work environment, race discrimination, and retaliation claims pursuant to

the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the

New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  In an

earlier Opinion and Order, the Court dismissed Wilson's claims with leave to file an amended

complaint.  *See Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558 (JMF), 2021 WL

918770 (S.D.N.Y. Mar. 10, 2021) (ECF No. 72).  Thereafter, Wilson filed the operative Second

Amended Complaint ("SAC").  ECF No. 77 ("SAC").[1]  JPMorgan now moves, pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Wilson's amended claims.  *See* ECF

No. 79.  For the reasons that follow, the motion is GRANTED in part and DENIED in part.

---

[1]       In her earlier Complaint, Wilson had also named Jamie Dimon — JPMorgan's Chief
Executive Officer and Chair of the Board — as a Defendant.  ECF No. 20 ("FAC"), ¶¶ 151-168.
The SAC names only JPMorgan.  *See* SAC ¶ 2.

## BACKGROUND

The relevant background is set forth in the Court's prior Opinion and Order, familiarity with which is assumed, and will not be repeated here.  *See* 2021 WL 918770, at *1-3.  Instead, the Court will merely summarize the relevant differences between the earlier Complaint and the operative SAC.  Before doing so, however, the Court must address two preliminary matters.

First, JPMorgan contends that the Court should disregard certain allegations in the SAC because they "directly contradict" the facts pleaded in Wilson's earlier complaints.  ECF No. 80 ("Def.'s Mem."), at 12; *see also id.* at 8-10, 11-14.  A court may disregard factual allegations in an amended complaint where the plaintiff "blatantly changes" her story in a way that "directly contradicts" her earlier pleadings.  *Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (internal quotation marks omitted), *aff'd sub nom. Colliton v. Cravath, Swain & Moore LLP*, 356 F. App'x 535 (2d Cir. 2009) (summary order); *see also, e.g.*, *Wallace v. NYC Dep't of Corr.*, No. 95-CV-4404 (SJ), 1996 WL 586797, at *1-2 (E.D.N.Y. Oct. 9, 1996) (disregarding the assertion in an amended complaint that an action was taken pursuant to an official policy because the original complaint contended that the action was an aberration from that policy).  "[T]he more usual and benevolent option," however, "is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course."  *Baines v. City of New York*, No. 10-CV-9545 (JMF), 2015 WL 3555758, at *1 (S.D.N.Y. June 8, 2015) (quoting *Barris v. Hamilton*, No. 96-CV-9541 (DAB), 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999)); *see also Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 266 (S.D.N.Y. 2008) (noting that courts typically disregard subsequent pleadings only where they are "blatant" or "directly contradictory" as opposed to merely "inconsistent" (internal quotation marks omitted)); *2002 Lawrence R. Buchalter Alaska*

*Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015) ("[C]ourts in the Second Circuit will consider prior pleadings" only "[i]n rare circumstances" where "the plaintiff directly contradicts the facts set forth in his original complaint." (internal quotation marks omitted)).

Here, the latter, "more benevolent option" is warranted because the discrepancies between the SAC and Wilson's earlier pleadings are not the sort of "blatant" contradictions that have caused other courts to disregard allegations in amended pleadings. *Kermanshah*, 580 F. Supp. 2d at 266. JPMorgan argues that Wilson now "relies upon wholly new allegations of explicit, 'overt' race-based conduct." Def.'s Mem. at 12; *see also id.* at 8-10; ECF No. 82 ("Def.'s Reply"), at 1-6. But Wilson's FAC did not deny that she experienced overt race-based conduct during her employment at JPMorgan; in fact, it made repeated reference to "racism" at JPMorgan. *See, e.g.*, FAC ¶ 76 (reproducing email to upper management in which Wilson referenced "[r]acism at its best" at JPMorgan); *id.* ¶ 79 (same, stating "[m]odern day racism is in full effect at JPMorgan").[2] At bottom, the SAC merely adds allegations of specific instances of overt race-based conduct. *See, e.g.*, SAC ¶¶ 36-37, 46-48, 50, 60-64. Such changes, "when taken as a whole," can "be described as clarifying [and], at most, as inconsistent." *2002*

---

[2]     Wilson did go further in her briefing with respect to JPMorgan's earlier motions to dismiss — conceding, for example, that she "was not subjected to an overt display of racism" while at JPMorgan. ECF No. 63 ("Pl.'s Opp'n to MTD FAC"), at 2; *see also id.* at 14 n.2, 17. But the law is clear that a plaintiff may not amend her complaint through a brief in opposition to a motion to dismiss, *see, e.g.*, *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004), and it is Wilson's allegations in the FAC that matter in evaluating whether to disregard the allegations in the SAC, *see Kermanshah*, 580 F. Supp. 2d at 266 (declining to disregard allegations in an amended complaint because plaintiff "ha[d] not made changes that directly contradict the *facts set forth in the original complaint*" (emphasis added)); *Streit v. Bushnell*, 424 F. Supp. 2d 633, 639 n.4 (S.D.N.Y. 2006) (same).

*Lawrence R. Buchalter Alaska Tr.*, 96 F. Supp. 3d at 207 (cleaned up).  Thus, the Court will treat the SAC as the sole operative pleading for present purposes, without prejudice to JPMorgan arguing "in due course" that the earlier pleadings should be treated "as admissions."  *Baines*, 2015 WL 3555758, at *1 (quoting *Barris*, 1999 WL 311813, at *2).

Second, JPMorgan argues that, in amending her complaint, Wilson "went well beyond the latitude afforded by the Court" in its prior Opinion and Order.  Def.'s Mem. 2; *see also id.* at 8-10.  The Court disagrees.  In granting leave to amend, the Court did not bar Wilson from alleging facts related to overt racial discrimination or harassment.  *See Wilson*, 2021 WL 918770, at *8.  Nor did it limit Wilson to elaborating on specific incidents already included in her FAC. *See id.*  Instead, the Court granted leave to amend because it "conclude[d] that Wilson [might] be able to allege sufficient additional facts to remedy at least some of the defects in her claims (*e.g.*, by adding more of the particulars to the allegations in Paragraphs 24 and 78)."  *Id.* (emphasis added).  Thus, the Court's permission to file an amended complaint was not quite as limiting as JPMorgan suggests.  More to the point, by adding more specific allegations of race-based conduct, *see, e.g.*, SAC ¶¶ 36-37, 46-48, 50, 60-64, similar to the allegations in Paragraphs 24 and 78 of the FAC, Wilson acted squarely within the scope of the Court's leave to amend. Accordingly, the Court declines JPMorgan's invitation to disregard the allegations in the SAC.

With that, the Court turns to the new allegations in the SAC, which are presumed to be true for purposes of this motion.  *See, e.g.*, *Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013).  Four new sets of allegations are particularly relevant.  The first relates to Wilson's experience in the executive wing.  Specifically, Wilson alleges that:

- After becoming an Executive Administrative Assistant, Wilson "was referred to as the 'African American Barbie' in the executive wing."  SAC ¶ 36.

- Wilson was subjected to more stringent security protocols in the executive wing than non-African Americans when covering for other secretaries. *Id.* ¶¶ 39-43. On one occasion when Wilson was covering for Gemma Antczak ("Antczak"), a Senior Executive Administrative Assistant working in the executive wing, "Antczak was required to send an email authorization to the head of security and all of the non-African American executive assistants on the floor," providing them with Wilson's "identification and the time she would arrive and leave." *Id.* ¶¶ 39-40. If Wilson needed to stay any longer, Antczak's supervisor "would have to physically come out of his office [to] authorize" the extension. *Id.* ¶ 40. There were "no such . . . require[ments] for non-African American secretarial coverage." *Id.* ¶ 41.

- "Generally, African American employees that did not work in the food pantry or for the cleaning service were not permitted entry to the executive wing." *Id.* ¶ 38.

- "Prior to [Wilson's] promotion to the executive wing in 2006, there had not been an African American secretary on that level." *Id.* ¶ 44.

The second relevant set of new allegations concerns several incidents involving Richard Sabo, the former Managing Director and Chief Investment Officer of Pension and Retirement at JPMorgan who served as Wilson's "boss[]," *id.* ¶ 36, for an unspecified period of time following her promotion to Executive Administrative Assistant. Wilson alleges that:

- Wilson "routinely heard her non-African American bosses Richard Sabo . . . [and] Richard Samson, also a Managing Director[,] . . . refer to African Americans as 'those people[.]' In referring to African Americans, Sabo said 'those people think they can go to Yale and Harvard and it will change who they are and it won't.'" *Id.* ¶¶ 36-37.

- "Sometime in 2013," Wilson invited an African American co-worker, Daphne Williams ("Williams"), to the executive wing for a visit, where Wilson introduced Williams to Sabo. *Id.* ¶ 46. Once Williams left, Sabo told Wilson, "'[Y]ou work up here now and you need to leave those people downstairs.'" *Id.* ¶ 47. When Wilson "pushed back and said *she* was one of 'them[,]'" Sabo responded[,] 'NO, you are not like them and that is why you are up here. If you want to grow within JPMorgan you need to leave them where they are and pay attention to your new environment.'" *Id.* ¶ 48.

- "During one of [Wilson's] performance reviews with Sabo," in which she received positive feedback, Wilson "requested a title change from Executive Administrative Assistant to *Senior* Executive Administrative Assistant. Sabo refused and responded that Senior Executive Assistants were exclusively non-African American so [Wilson] needed to choose her battle of salary/bonus or title change." *Id.* ¶ 50. Wilson ultimately chose to increase her "salary/bonus." *Id.* ¶ 51. As a result, "her

compensation [was] the same as a Senior Executive Assistant," but her "title [no longer] match[ed] her salary." *Id.*

Third, Wilson describes additional events relating to management of African American members of JPMorgan's secretarial staff and the audit department. She alleges that:

- Due to the "discrepancy in the salaries and job assignments between the African American secretaries and the non-African American secretaries," JPMorgan, at an unspecified time, "had to hire an African American Business Manager to deal with the African American secretarial staff." *Id.* ¶ 45.

- "In March 2017," James Bell, "the newly appointed Chair of JPMorgan['s] . . . Board of Director's Audit Committee, was brought in to [JPMorgan] to improve the working relationship between African American and non-African American employees." *Id.* ¶ 54.

- During a "Fireside Chat," Bell "said he was brought in to investigate why [JPMorgan's] Audit department did not have any African Americans in senior positions." *Id.* ¶ 55. Bell also "candidly admitted . . . that [JPMorgan's] non-African American Analysts, Managers, Vice Presidents and Managing Directors on the whole view African Americans as thieves, drug dealers or a threat [of] physical violence." *Id.* ¶ 56.

Finally, Wilson recounts additional interactions with Janet Jarnagin, an Executive Director who was assigned to serve as Team Leader under Managing Director Paul Jensen at the same time as Wilson was serving as his Executive Administrative Assistant. *See id.* ¶¶ 57-58. Specifically, the SAC alleges that:

- While sitting at her desk, which was "less than six feet apart" from Wilson's desk, Jarnagin would "routinely . . . 'sing' along" to music that she was listening to using headphones by "shouting out offensive song lyrics that included the [n-word]." *Id.* ¶¶ 59-60. "Everyone in the vicinity of Jarnagin including [Wilson], who was the only African American in the room, [was] able to hear Jarnagin 'singing' out loud the [n-word]." *Id.* ¶ 61.

- Jarnagin would ask only Wilson "why . . . African American people write songs and call each other [n-word] and then get angry when non-African American people do it." *Id.* ¶ 62. When Wilson "would respond that it was offensive and that those songs made [her] uncomfortable and that she did not like or listen to rap songs," Jarnagin would "minimize" Wilson's "distress" and justify her behavior by "claiming that she was from Atlanta and that it was 'not a big deal.'" *Id.* ¶¶ 63-64.

- "Jarnagin constantly verbally reminded [Wilson] that she, as an African American, 'did not belong.'" *Id.* ¶ 66.

- "On one occasion [when] the team was gathering for drinks after work," Jarnagin made a "snide comment" that only African Americans faced the threat of lynching. *Id.* ¶¶ 87-88.

- The first day at work after the 2016 presidential election, when Donald Trump was elected following Barack Obama's second term, Jarnagin told Wilson, "[W]e are back in charge." *Id.* ¶¶ 67-68.  Wilson understood "we" to mean "non-African Americans." *Id.* ¶ 68.  "The very next day," Jarnagin "handed [Wilson her] coat and instructed [Wilson] to hang it up," even though "[n]one of the other executive administrative assistants who were non-African American were expected to hang up coats." *Id.* ¶¶ 69-70.

- Jarnagin "singled out and mocked [Wilson] about her food and advised [Wilson] to count calories because [Wilson] would be beautiful if she lost weight." *Id.* ¶ 73.  She "did not say these things to the non-African American assistants." *Id.* ¶ 74.

- Jarnagin "often reduced [Wilson] to pronouns by referring to [Wilson] as 'her' and 'she' in [Wilson's] presence," which was "not something Jarnagin did to the non-African American secretaries." *Id.* ¶¶ 75-76.

- Jarnagin "publicly interrogate[d] [Wilson] about her clothes and question[ed] [Wilson's] ability to afford high-end designer clothing by St. John and Chanel," but "did not ask any of the non-African American secretaries how they paid for their clothes." *Id.* ¶ 79.

- Wilson "complained to [JPMorgan's] human resources department . . . and to Jensen" about Jarnagin's conduct. *Id.* ¶ 80.  Jensen "gas-lit [Wilson] and accused her as he routinely did of being 'dramatic' about Jarnagin's conduct in singing out loud the [n-word]" and engaging in other behavior that "Jarnagin did not engage in with non-African American administrative assistants." *Id.*

- On one occasion, when Wilson informed Jarnagin that a (presumably non-white) co-worker was "changing her vacation to a later date," Jarnagin asked, "[W]hat's the matter she can't get her green card?" *Id.* ¶ 89.

- Jarnagin "spread[] false rumors" about Wilson that "caused [Wilson's] entire team to ostracize her." *Id.* ¶ 90.

- "Several of Wilson's colleagues recognized" that Jarnagin was "mistreat[ing]" Wilson. *Id.* ¶ 81; *see id.* ¶¶ 82-84.  One colleague, Antczak, "counseled [Wilson] to ignore Jarnagin as 'she is a racist.'" *Id.* ¶ 83.

## LEGAL STANDARDS

As noted in the Court's prior Opinion and Order, *see* 2021 WL 918770, at *4, in evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all facts set forth in the SAC as true and draw all reasonable inferences in Wilson's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. Where, as here, a plaintiff brings claims of employment discrimination, however, the facts alleged in the complaint "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87 (2d Cir. 2015).

## DISCUSSION

Wilson's claims are brought under the NYCHRL and NYSHRL. Specifically, she brings claims for: (1) the creation of a hostile work environment; (2) race discrimination; and (3) retaliation. The Court will address each set of claims in turn.

## A. Hostile Work Environment Claims

The Court begins with Wilson's hostile work environment claims.  As the NYCHRL and NYSHRL standards differ in important ways, the Court will address them separately.

### 1. NYCHRL

To state a hostile work environment claim under the NYCHRL, a plaintiff must show that she was "'treated less well than other employees because of'" her membership in a protected class.  *Ardigo v. J. Christopher Cap., LLC*, No. 12-CV-3627 (JMF), 2013 WL 1195117, at *4 (S.D.N.Y. Mar. 25, 2013) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009)); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) (To prevail under the NYCHRL "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.").  Significantly, severe or pervasive hostility is not required, and "even a single comment may be actionable in the proper context." *Mihalik*, 715 F.3d at 113.  That said, "the NYCHRL is not a 'general civility code,'" and "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Id.* at 110 (quoting *Williams*, 872 N.Y.S.D.2d at 40).  The plaintiff "must show that she has been treated less well at least in part *because of* her [membership in a protected class]." *Id.* (internal quotation marks omitted).  "A discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that . . . comparators were treated better than [the plaintiff] was." *Ibrahim v. Fid. Brokerage Servs. LLC*, No. 19-CV-3821 (VEC), 2020 WL 107104, at *5 (S.D.N.Y. Jan. 9, 2020) (cleaned up); *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("[E]vidence of discriminatory comments . . . can constitute 'direct evidence,' and are adequate to make out a prima facie case [of

discrimination].”); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (“[E]vidence of disparate treatment *may* establish the inference of discrimination, . . . [b]ut such evidence is not always necessary . . . [where] a plaintiff may rely on direct evidence of what the defendant did and said.” (cleaned up)).

Measured against these standards, the SAC alleges a plausible hostile work environment claim under the NYCHRL.  Unlike her FAC, Wilson’s SAC plausibly alleges that she was treated less well “at least in part *because of*” her race.  *Mihalik*, 715 F.3d at 110 (internal quotation marks omitted).  Indeed, as JPMorgan itself concedes, the SAC alleges numerous incidents of “explicit, ‘overt’ race-based conduct” in support of her hostile work environment claims.  Def.’s Mem. 12; *see also id.* at 10, 12-13; Def.’s Reply 1, 4.  Most notably, these allegations include being referred to as the “‘African American Barbie’ in the executive wing,” SAC ¶ 36; “routinely” hearing her supervisors “refer to African Americans as ‘those people,’” including on one occasion where her supervisor said, “those people think they can go to Yale and Harvard and it will change who they are and it won’t,” *id.* ¶¶ 36-37; being reprimanded by her supervisor after allowing another African American co-worker to visit the executive wing, and being told, “[Y]ou need to leave those people downstairs. . . . [Y]ou are not like them and that is why you are up here.  If you want to grow within JPMorgan you need to leave them where they are[,]” *id.* ¶¶ 47-48; and repeated use of the n-word by a non-African American co-worker within Wilson’s earshot despite Wilson’s protests, *id.* ¶¶ 59-64.  In addition, the SAC alleges instances of disparate treatment and implicitly racially motivated harassment.  For instance, Wilson had to undergo stringent security protocols in the executive wing that non-African American assistants were not required to follow.  *See* SAC ¶¶ 39-43.  And she was told by the Chair of JPMorgan’s Board of Director’s Audit Committee at a Fireside Chat that JPMorgan’s “non-African American

Analysts, Managers, Vice Presidents and Managing Directors on the whole view African

Americans as thieves, drug dealers or a threat [of] physical violence." *Id.* ¶ 56.

Taken together, these allegations of both overt and implicitly race-based harassment

easily satisfy Wilson's burden to plead sufficient facts to "show that her employer treated her

less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8; *see, e.g.*,

*Modica v. New York City Dep't of Educ.*, No. 20-CV-4834 (JMF), 2021 WL 3408587, at *7

(S.D.N.Y. Aug. 4, 2021) (holding that supervisor having allegedly "ridiculed" plaintiff in a

mediation meeting "on the basis of her disability" was "enough to plead a plausible NYCHRL

hostile work environment claim"); *Sanderson v. Leg Apparel LLC*, No. 19-CV-8423 (GHW),

2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (holding that allegations about a supervisor

making three comments about plaintiff's perceived sexual orientation to "embarrass" him and

"diminish [his] success" were enough to state a NYCHRL hostile work environment claim);

*Shukla v. Deloitte Consulting LLP*, No. 19-CV-10578 (AJN) (SDA), 2020 WL 3181785, at *11

(S.D.N.Y. June 15, 2020) (holding that a single comment that the plaintiff was an "expendable

Indian" at a time when he was being removed from a project was sufficient to state a claim that

he was treated less well as a result of his race or national origin); *see also Schwapp v. Town of

Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (noting that "a racially derogatory comment" or "racial

epithet need not be directed at a plaintiff in order to contribute to a hostile work environment");

*Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("[A] plaintiff need only allege that she

suffered a hostile work environment because of her [protected characteristic], not that all of the

offensive conduct was *specifically* aimed at her.").  Accordingly, JPMorgan's motion to dismiss

Wilson's hostile work environment claim under the NYCHRL must be and is denied.[3]

## 2.  NYSHRL

To state a hostile work environment claim under the NYSHRL, Wilson must plead facts

showing that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and

insult[] that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l

Transp. Auth.*, 743 F.3d 11, 20 & n.4 (2d Cir. 2014) (internal quotation marks omitted); *see

Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) ("Hostile work environment

claims under both Title VII and the NYSHRL are governed by the same standard.").[4]  The

---

[3]     The Court need not and does not address JPMorgan's argument that Wilson's allegations
related to "Sabo and Samson (from around 2013)" are "barred by the applicable three-year
statute of limitations," Def.'s Mem. 12 n.4, because even if that were the case, Wilson's hostile
work environment claim under the NYCHRL would survive.  Moreover, "a statute of limitations
defense may be decided on a Rule 12(b)(6) motion" only "if the defense appears on the face of
the complaint," *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (internal quotation
marks omitted), and the SAC is largely silent with respect to the timing of the Sabo's and Samson's
conduct.  Additionally, whenever it happened, the conduct may be cognizable pursuant to the
continuing violations doctrine.  *See, e.g.*, *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d
Cir. 2010) (noting that hostile work environment claims occur "over a series of days or perhaps
years" and, as such, the court may consider "the entire scope of a hostile work environment
claim, including behavior alleged outside the statutory time period, . . . for the purposes of
assessing liability" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)));
*see also, e.g.*, *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011)
(applying the continuing violation doctrine to NYCHRL and NYSHRL claims).  For that reason,
the Court relies here on the one episode in the SAC related to Sabo and Samson that is dated —
namely, Sabo's response to Wilson's having invited another African American co-worker to visit
the executive wing, which occurred "[s]ometime in 2013."  SAC ¶¶ 46-48.

[4]     Wilson notes that, "[e]ffective October 11, 2019, New York amended and broadened the
protections under the NYSHRL to replace the term 'severe or pervasive' with the term 'petty
slights and trivial inconveniences,' tracking the language of the NYCHRL."  ECF No. 81 ("Pl.'s
Opp'n"), at 17 n.3 (citing N.Y. Exec. Law § 296).  That is true, *see Ruiz v. Bay Shore-
Brightwaters Rescue Ambulance, Inc.*, No. 18-CV-280 (RRM), 2021 WL 1210315, at *13 n.7
(E.D.N.Y. Mar. 31, 2021), but the new standard does not apply here because Wilson's claims
accrued before October 11, 2019, *see McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51,

"standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).  The standard is more demanding than its counterpart under the NYCHRL.  At the same time, the Second Circuit has "repeatedly cautioned against setting the bar too high," emphasizing that the ultimate "test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (cleaned up).

Applying these standards, the Court concludes that Wilson's NYSHRL hostile work environment claim also survives.  First, taken together, the conduct discussed above — including the persistent racially derogatory comments directed at Wilson and other non-African Americans, *see, e.g.*, SAC ¶¶ 36-37, 46-48, 56, and the repeated use of the n-word in Wilson's presence despite her protests, *id.* ¶¶ 60-64 — were "severe [and] pervasive enough that a reasonable person would find [the conduct] hostile or abusive." *Raspardo*, 770 F.3d at 114; *see also, e.g.*, *Raji v. Societe Generale Americas Sec. LLC*, No. 15-CV-1144 (AT), 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018) (having "no trouble concluding that Defendants' actions, as alleged by Plaintiff, amount[ed] to 'severe and pervasive harassment'" where Defendants "questioned Plaintiff on his sexuality, questioned why Plaintiff did not have a girlfriend, called him by a French slur approximately thirty to forty times, and discussed or ridiculed the sexual orientations of other co-workers . . . on multiple occasions"); *cf. Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 258 (S.D.N.Y. 2014) (concluding that, although

---

68-69 (S.D.N.Y. 2020); *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

whether plaintiff had satisfied the objective prong was a "close and difficult question," the pleadings were not "so inadequate as to warrant dismissal" as a matter of law since "assessment of such intermediate allegations is best left to the jury").  Second, as she did in the FAC, *see* 2021 WL 918770, at *5, Wilson plausibly pleads that she "subjectively perceive[d] the work environment to be abusive," *Raspardo*, 770 F.3d at 114, given the mental and physical effects that she alleges Jarnagin's mistreatment caused*, see* SAC ¶¶ 104-108, 154.  And, lastly, as discussed above, Wilson plausibly alleges that "she was subjected to the hostility *because of* her membership in a protected class." *Kassner*, 496 F.3d at 241 (emphasis added); *see also Ibrahim*, 2020 WL 107104, at *5 ("A discriminatory motive can be shown . . . by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic." (cleaned up)).  Accordingly, JPMorgan's Rule 12(b)(6) motion to dismiss Wilson's NYSHRL hostile work environment claim must be and is DENIED.

## B.  Race Discrimination Claims

Next, Wilson brings race discrimination claims under the NYCHRL and NYSHRL. There is no need to dwell on these claims under the NYCHRL because, unlike the NYSHRL, the NYCHRL draws "no distinction between a claim premised on the creation of a hostile work environment (a species of harassment claim) and one premised on unlawful discrimination." *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *9 n.12 (S.D.N.Y. Feb. 28, 2019); *see also Clarke v. InterContinental Hotels Grp., PLC*, No. 12-CV-2671 (JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims; rather, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based [on protected characteristics]." (internal quotation marks omitted) (citing

N.Y.C. Admin. Code § 8-107(1)(a)); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (same) (citing *Williams*, 872 N.Y.S.2d at 37), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (per curiam).  Thus, JPMorgan's motion to dismiss Wilson's NYCHRL race discrimination claim must be and is DENIED for the reasons discussed above.

Race discrimination claims under the NYSHRL are typically analyzed under the three-step burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  At the motion to dismiss stage, only the first step of that framework — namely, the plaintiff's burden to allege a prima facie case of discrimination — is at issue.  "[A]bsent direct evidence of discrimination," a plaintiff must plead "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) [that she] can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation."  *Littlejohn*, 795 F.3d at 311 (emphasis omitted).  By contrast, "where the plaintiff presents *direct* evidence of discrimination[,] . . . the *McDonnell Douglas* test is inapplicable."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (emphasis added); *see also Vega*, 801 F.3d at 82 (explaining that the *McDonnell Douglas* test applies to "employment discrimination cases . . . where a plaintiff does not have direct evidence of discrimination"); *Grant v. Hazelett Strip Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir. 1989) ("In cases where a plaintiff can present direct evidence of discrimination . . . the burdens of proof outlined in *McDonnell Douglas* need not apply." (emphasis omitted)); *Cameron v. New York City Dep't of Educ.*, No. 15-CV-9900 (KMW), 2018 WL 1027710, at *7 (S.D.N.Y. Feb. 21, 2018) ("Because [the plaintiff] has provided direct evidence of discrimination, *McDonnell* is inapplicable.").  Even then, however, a plaintiff must still identify an "adverse employment

action" — that is, "a materially significant disadvantage with respect to the terms of [the plaintiff's] employment." *Littlejohn*, 795 F.3d at 312 n.10 (emphasis omitted); *see also Cameron*, 2018 WL 1027710, at *7.

Here, as JPMorgan contends, Wilson alleges only one "adverse employment action": Sabo's alleged refusal to promote her from Executive Administrative Assistant to Senior Executive Administrative Assistant. *See* Def.'s Mem. 14; SAC ¶ 50.[5]  As to that action, Wilson plainly states a plausible claim of race discrimination.  As noted, Wilson alleges that, "[d]uring one of [her] performance reviews," Sabo "refused" her request for a title change from Executive Administrative Assistant to Senior Executive Administrative Assistant and stated that "Senior Executive Assistants were exclusively non-African American so [Wilson] needed to choose her battle of salary/bonus or title change." *Id.* ¶ 50.  This overtly race-based justification for denying Wilson a title promotion, coming from a direct supervisor no less, unquestionably "make[s] out a prima facie case" of race discrimination under the NYSHRL.  *Back*, 365 F.3d at 124 ("[E]vidence of discriminatory comments . . . can constitute 'direct evidence,' and are adequate to make out a prima facie case, even where uncorroborated."); *see also, e.g.*, *Holtz*, 258 F.3d at 77 (vacating decision granting summary judgment to the defendant as to an age discrimination claim for failure to train because the plaintiff provided "direct evidence" of a discriminatory motive, including comments made by the head of the department explicitly connecting decisions

---

[5]     Conspicuously, Wilson does not really argue otherwise.  The closest she comes is to cite the SAC's entire Statement of Facts as evidence of "adverse actions which could be deemed discriminatory."  Pl.'s Opp'n 20 (citing SAC ¶¶ 20-182).  But that is not a valid argument.  *See Fieldcamp v. City of New York*, 242 F. Supp. 2d 388, 391 (S.D.N.Y. 2003) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue.").  In any event, except for Sabo's refusal to grant Wilson a promotion, the SAC does not allege any discrete acts that could qualify as adverse employment actions under the NYSHRL.  *See Littlejohn*, 795 F.3d at 312 n.10; *cf. Morgan*, 536 U.S. at 110 (noting that race discrimination claims under Title VII are based on "discrete discriminatory acts").

to train other employees to their "young" age); *Cameron*, 2018 WL 1027710, at *8 (denying a

motion for summary judgment as to a Title VII discrimination claim because the plaintiff

"offered direct evidence of discrimination," including comments made by a supervisor about her

"pregnan[cy]" in connection with declining to call her for substitute teaching jobs).

JPMorgan makes a compelling case that Wilson's claim based on this incident is time

barred because Sabo has not worked for the company since 2014 — well outside the three-year

statute of limitations.  *See* Def.'s Mem. 14 n.5.  But that is not a valid basis for dismissal at this

stage of the litigation because "a statute of limitations defense may be decided on a Rule 12(b)(6)

motion" only "if the defense appears on the face of the complaint," *Thea*, 807 F.3d at 501, and

the SAC is (one hopes, not for strategic reasons) silent with respect to the timing of the incident

and Sabo's departure from JPMorgan.[6]  JPMorgan's only other argument for dismissal is that,

the allegations concerning Sabo notwithstanding, Wilson's race discrimination claim should be

dismissed because she "does not allege what qualifications are necessary to become a Senior

Executive Administrative Assistant" or plead "that any particular non-Black comparators

received a promotion over her, or that any such individuals were less qualified or that there was

an opening for a Senior Executive Administrative Assistant at any particular time."  Def.'s Mem.

15.  As noted, however, a plaintiff need not make such allegations to establish a prima facie case

where, as here, there is direct evidence of discrimination, such as "discriminatory comments"

made by a supervisor in connection with an adverse employment decision.  *Back*, 365 F.3d at

---

[6]     If Sabo did, in fact, leave JPMorgan in 2014, Wilson should give serious thought to
whether there is a good faith basis to continue pursuing her race discrimination claim under the
NYSHRL, mindful that "a court may impose sanctions on a party for refusing to withdraw an
allegation or claim even after it was shown to be inaccurate."  *Galin v. Hamada*, 283 F. Supp. 3d
189, 202 (S.D.N.Y. 2017) (cleaned up), *aff'd*, 753 F. App'x 3 (2d Cir. Oct. 4, 2018) (summary
order); *see also Morgan*, 536 U.S. at 105, 114 (noting that the continuing violation doctrine does
not apply to claims based on discrete acts).

124; *see also, e.g.*, *Yang v. Dep't of Educ. of the City of New York*, No. 14-CV-7037 (SLT) (RLM), 2016 WL 4028131, at *8 (E.D.N.Y. July 26, 2016) (holding that the plaintiff adequately alleged discriminatory motive in a Title VII action based on "direct evidence of discrimination," where the plaintiff had alleged that his supervisor made derogatory comments regarding his accent and nationality).  Accordingly, JPMorgan's motion to dismiss Wilson's NYSHRL race discrimination claim is also DENIED.

## C.  Retaliation Claims

Wilson's final claims — for retaliation — require little discussion because the relevant allegations in the FAC and the SAC, concerning causation, are virtually identical.  *Compare* SAC ¶¶ 206-19, *with* FAC ¶¶ 139-50.  Indeed, Wilson does not deny that she "fail[ed] to remedy the deficiencies in her retaliation claims" identified by the Court's prior Opinion and Order, as JPMorgan contends.  Def.'s Mem. 15; *see* Pl.'s Opp'n 20-23.  Instead, she repeats the *same* list of allegedly retaliatory acts from her opposition to JPMorgan's motion to dismiss her FAC, *compare* Pl.'s Opp'n to MTD FAC 19-20, *with* Pl.'s Opp'n 22-23, and states that "[t]he adverse action taken against [Wilson] by the Defendants [sic] after she complained of hostile work environment and discrimination clearly evidence a causal connection," Pl.'s Opp'n 22.  Likewise, in the SAC itself, Wilson lists the same set of allegedly retaliatory acts in support of her retaliation claims that were included in her FAC.  *Compare* SAC ¶¶ 209, 216, *with* FAC ¶¶ 141, 147.[7]  As the Court held in its prior Opinion and Order, this is not enough "to allege a

---

[7]     There are two differences between the retaliation-related allegations in the FAC and those in the SAC, but they do not pertain to causation.  *Compare* FAC ¶¶ 141, 147, *with* SAC ¶¶ 209, 216 (adding that Wilson's allegations related to an incident where she was referred to as an "angry African American woman" was "confirmed by [JPMorgan's] designated medical doctor Dr. Conti"), *and* SAC ¶¶ 208, 215 (adding that JPMorgan's conduct amounted to "a continuing campaign of immense racist hostility, racial discrimination and retaliation which occurred from approximately March 2016 and culminated in May/June 2018").

18

plausible causal connection between any of th[e adverse] actions [identified by Wilson] . . . and her protected activities." 2021 WL 918770, at *7. Thus, Wilson's retaliation claims under both the NYCHRL and the NYSHRL must be and are DISMISSED.

## CONCLUSION

For the reasons stated above, JPMorgan's motion to dismiss is GRANTED in part and DENIED in part. Specifically, the Court holds that Wilson's hostile work environment and race discrimination claims under the NYCHRL and NYSHRL cannot be dismissed, but her retaliation claims must be and are dismissed. Unless and until the Court orders otherwise, JPMorgan shall file its answer to Wilson's remaining claims within three weeks. By separate Order to be issued today, the Court will schedule an initial pretrial conference.

The Clerk of Court is directed to terminate ECF No. 79 and to terminate Defendants Jamie Dimon, Jane and/or John Does 1-10, and XYZ Entities 1-10.

SO ORDERED.

Dated: November 8, 2021
New York, New York

_____
JESSE M. FURMAN
United States District Judge